David J. Hacker, SBN 249272
dhacker@firstliberty.org
Nathan W. Kellum, *pro hac vice**
TN 13482; MS 8813
nkellum@firstliberty.org
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy, Suite 1600
Plano, TX 75075

Kayla A. Toney, *pro hac vice**
VA 93815; DC 1644219
ktoney@firstliberty.org
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW Suite 1410
Washington, DC 20004
(202) 918-1554
*Application forthcoming

Dean R. Broyles, SBN 179535
The National Center for Law &
Policy
539 West Grand Avenue
Escondido, California 92025
(760) 747-4529
dbroyles@nclplaw.org

Robert J. Reynolds, SBN 151243
Law Office of Robert J. Reynolds
16950 Via de Santa Fe, Suite
5060-145
Rancho Santa Fe, CA 92091
619-261-3393
rjrsdesk@yahoo.com

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

S.E., a minor by and through his parents,
CARLOS AND JENNIFER ENCINAS;
CARLOS AND JENNIFER ENCINAS;
P.D., a minor by and through his parents,
TOM AND REBECCA DOE; TOM
AND REBECCA DOE,
            *Plaintiffs*,
    v.
ANDRÉE GREY, in her official capacity
as Superintendent of the Encinitas Union
School District, and in her individual
capacity; AMY ILLINGWORTH, in her
official capacity as Assistant
Superintendent of the Encinitas Union
School District, and in her individual
capacity; CHRISTIE KAY, in her
official capacity as Principal of La Costa

Case No. **'24CV1611 BEN SBC**

**VERIFIED COMPLAINT FOR:**

1. **Violation of Free Speech Clause
   of First Amendment to U.S.
   Constitution: Compelled
   Speech**

2. **Violation of Free Exercise
   Clause of First Amendment to
   U.S. Constitution: Not Neutral
   or Generally Applicable**

1

Heights Elementary School, and in her individual capacity; SEAN MURPHY, in his official capacity as Teacher at La Costa Heights Elementary School, and in his individual capacity; KATHRYN WEST, in her official capacity as Teacher at La Costa Heights Elementary School, and in her individual capacity; EMILY ANDRADE, in her official capacity as a board member of the Encinitas Union School District; TOM MORTON; in his official capacity as a board member of the Encinitas Union School District, MARLA STRICH; in her official capacity as a board member of the Encinitas Union School District; MARLON TAYLOR, in his official capacity as a board member of the Encinitas Union School District; JODIE WILIAMS, in her official capacity as a board member of the Encinitas Union School District,

*Defendants.*

**3. Violation of Free Exercise Clause of First Amendment to U.S. Constitution: Religious Upbringing of Children**

**4. Violation of Due Process Clause of Fourteenth Amendment to U.S. Constitution: Parental Rights**

**5. Violation of Due Process Clause of Fourteenth Amendment to U.S. Constitution: Lack of Notice**

**6. Injunctive and Declaratory Relief; Nominal Damages**

## INTRODUCTION

1.   This is a civil rights action challenging a public school program that subjects elementary school students to "equity" books and other instruction on gender identity in conflict with their and their parents' religious beliefs and then forces them to affirm and convey this instruction to younger students whom they have mentored over the course of the school year – without giving their parents an opportunity to opt out of the program or advance notice of the activity.

2.     On May 1, 2024, school officials at La Costa Heights Elementary School ("La Costa Heights") in the Encinitas Union School District ("School District" or "District") exposed fifth grade students and plaintiffs S.E. and P.D. to *My Shadow is Pink*, a book that advances gender identity contrary to their and their parents' religious beliefs.  Immediately following the reading, school officials required S.E. and P.D. to affirm and teach the District's views on gender identity to kindergarteners as part of a mentor "buddy" program, through watching a *My Shadow is Pink* read-along video with their buddy, having their buddy choose a color for his shadow representing his own personal sense of gender, and chalking their buddy's shadow in the color and gender as chosen by the buddy.

3.     The School District mandates all schools within the District, including La Costa Heights, provide instruction and programming on gender identity along with other LGBTQ curriculum as part of a comprehensive health education.  According to California Education Code ("EDC") § 51240, parents can opt out of any health instruction that conflicts with religious training and beliefs, but the School District refuses to honor this right unless the health instruction is provided as part of its formal health unit instruction.

4.     Despite multiple requests from S.E. and P.D.'s parents, plaintiffs Carlos and Jennifer Encinas and Tom and Rebecca Doe, as well as other parents at La Costa Heights, the School District has steadfastly refused to grant an opt-out or to give notice of its instruction and programming promoting gender identity views that conflict with parental religious beliefs, except for its health unit.

5.     While the School District offers opt-outs from other types of instruction and curriculum for a wide variety of reasons, it refuses opt-outs from gender identity instruction outside of the formal health unit context.

3
VERIFIED COMPLAINT

6.   Defendants' policy and practices have deprived and will continue to deprive plaintiffs of their paramount rights guaranteed in the United States Constitution.

7.   Each and every act of defendants alleged herein was committed by defendants, each and every one of them, under the color of state law and authority.

## JURISDICTION AND VENUE

8.   The instant civil rights action raises federal questions under the First and Fourteenth Amendments to the U.S. Constitution, and 42 U.S.C. § 1983.

9.   This Court has original subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over plaintiffs' claims arising under the U.S. Constitution and laws of the United States.

10.   This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; the requested nominal damages under 28 U.S.C. § 1343; and costs and attorneys' fees under 42 U.S.C. §§ 1988.

11.   The constitutional violations are actionable under 42 U.S.C. § 1983.

12.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all events giving rise to the claims detailed in this complaint occurred within the Southern District of California, and at least one defendant resides in the Southern District of California.

## PLAINTIFFS

13.   Plaintiffs Carlos and Jennifer Encinas are residents of Carlsbad, California. They are also the parents of S.E., fully responsible for S.E.'s care, retaining custody and control.

14.   Plaintiff S.E. is an eleven-year-old male who brings this cause of action by and through his natural parents and next friends Carlos and Jennifer Encinas. S.E. was and is at all times material to this action a resident of Carlsbad, California, residing with his parents.  S.E. was at all times material to this action a student at La Costa Heights in the School District.

15.   Plaintiffs Tom and Rebecca Doe are also residents of Carlsbad, California.  They are the parents of P.D., fully responsible for P.D.'s care, retaining custody and control.

16.   Plaintiff P.D. is an twelve-year-old male who brings this cause of action by and through his natural parents and next friends Tom and Rebecca Doe.  P.D. was and is at all times material to this action a resident of Carlsbad, California, living with his parents.  P.D. was and is at all times material to this action a student at La Costa Heights in the School District.

**DEFENDANTS**

17.   The School District is a public agency in the State of California and within the meaning of Cal. Gov't Code § 7920.525(a).  It is empowered to and does govern La Costa Heights.  The principal place of operation for the School District is in Encinitas, California.

18.   Plaintiffs sue the School District by and through its Board Members in their official capacities, Emily Andrade, Tom Morton, Marla Strich, Marlon Taylor, and Jodie Williams.

19.   Defendant Emily Andrade is a current board member of the School District.  She is responsible for making decisions regarding School District policy, programming, and operations, and resides in this judicial district.

5

Verified Complaint

20. Defendant Tom Morton is a current board member of the School District. He is responsible for making decisions regarding School District policy, programming, and operations, and resides in this judicial district.

21. Defendant Marla Strich is a current board member of the School District. She is responsible for making decisions regarding School District policy, programming, and operations, and resides in this judicial district.

22. Defendant Marlon Taylor is a current board member of the School District. He is responsible for making decisions regarding School District policy, programming, and operations, and resides in this judicial district.

23. Defendant Jodie Williams is a current board member of the School District. She is responsible for making decisions regarding School District policy, programming, and operations, and resides in this judicial district.

24. Defendant Andrée Grey ("Superintendent Grey") was and is at all material times the Superintendent of the School District and has served in this position since 2019. As the Superintendent, Grey oversees and is responsible for applications of policies and programming in the schools within the District, including La Costa Heights. She is sued in both her individual and official capacities and resides in this judicial district.

25. Defendant Amy Illingworth ("Assistant Superintendent Illingworth") was and is at all material times the Assistant Superintendent of the School District and has served in this position since 2019. Assistant Superintendent Illingworth oversees and is responsible for the selection of curriculum for the entire school district, including La Costa Heights. She also assists the Superintendent with oversight of the School District's operations. Assistant Superintendent Illingworth

is sued in both her individual and official capacities and resides in this judicial district.

26.   Defendant Christie Kay ("Principal Kay") was at all material times the Principal of La Costa Heights in the School District, having served in that position from 2013 to July 2024.   As the Principal at La Costa Heights, Principal Kay oversaw and was responsible for operations of La Costa Heights and enforcing school district policies and programming.   Principal Kay is sued in both her individual and official capacities and resides in this judicial district.

27.   Defendant Sean Murphy ("Mr. Murphy") was and is at all material times a fifth-grade teacher at La Costa Heights in the School District, receiving tenured status in October 2021.   As a teacher, Mr. Murphy is responsible for selecting books and activities for his fifth-grade students, which include materials instructing them on gender identity and for use in their "buddy" program with younger students. Mr. Murphy is sued in both his individual and official capacities and resides in this judicial district.

28.   Defendant Kathryn West ("Ms. West") was and is at all material times a kindergarten teacher at La Costa Heights in the School District.   As a teacher, Ms. West is responsible for selecting books and activities for her kindergarten students to use during their "buddy" program with older students.   Ms. West is sued in both her individual and official capacities and resides in this judicial district.

## FACTUAL BACKGROUND

### *Plaintiff Parents' Sincere Religious Beliefs*

29.   Plaintiffs Carlos and Jennifer Encinas are devout Christians.   They are faithful members of a Bible-believing evangelical church and also of a Catholic

church in their local parish.  They regularly attend church with their children and raise their children in the Christian faith.

30.   Plaintiffs Tom and Rebecca Doe are devout Christians.  They are faithful members of their local Catholic church and parish and raise their children in the Christian faith.

31.   The religious faith of Plaintiffs Carlos and Jennifer Encinas and Tom and Rebecca Doe (jointly "Plaintiff Parents") shapes their roles as parents.

32.   Plaintiff Parents believe the Bible is the inspired and infallible Word of God that speaks as the final authority on truth, morality, and appropriate behavior. They follow the tenets of the Bible in raising their children.

33.   Plaintiff Parents believe, consistent with the teachings of the Bible and at their churches, that all humans are created in God's image as either male or female.

34.   Plaintiff Parents further adhere to biblical and church teaching that every man and woman should acknowledge and accept his sexual identity as male or female and that physical differences between sexes are complementary and beneficial to the flourishing of the family.

35.   As part of their Christian faith and tradition, Plaintiff Parents wholeheartedly believe sex is ordained by God, determined and designated by God alone, that everyone should love and care for the body God gives him or her, accept the biological sex given to him or her, and not deny that biological sex, or attempt to alter his or her sex through drugs, surgical means, or other means.  They also believe it is imperative to train their children in this understanding about biological sex.

36.   Plaintiff Parents also train their children to respect authority figures, which include their teachers and school administrators.

37.   Viewing children as a gift from God, Plaintiff Parents believe it is their responsibility as Christian parents to raise their children according to their sincerely held religious beliefs as delineated in Scripture.  School promotion of ideologies and concepts that run counter to their sincerely held religious beliefs undermines their parental authority and interferes with their essential roles as parents.

38.   Because of their sincere religious beliefs about sex and gender, Plaintiff Parents believe it is sinful and harmful for anyone to develop their own personal sense of gender that conflicts with biological sex and identify as such.

39.   Plaintiff Parents believe the School District should not encourage their minor children to question their God-given sex or gender or urge other students to do so, as this would force their children to betray their own religious beliefs.

40.   Plaintiff Parents further believe the School District should not compel their minor children to speak or act contrary to their religious beliefs in a school setting where they are temporarily apart from parental guidance and expected to comply with school authorities.

### S.E.'s Sincere Religious Beliefs and School Involvement

41.   Plaintiff S.E. maintains his own authentic Christian faith independent from his parents.  He is very involved in church and religious youth group, and frequently invites friends and classmates to attend church with him.  S.E. attends church camp every summer. He has a passion for Jesus and sharing the love of Jesus with his peers.

42. True to his Christian faith and understanding of biblical and church teaching, S.E. believes God created humans as either male or female, and humans are not at liberty to choose a gender different from God-given gender.

43. According to his Christian faith, S.E. also believes he is called to respect authority figures, like teachers and school administrators, in addition to his parents. For this reason, it is confusing and distressing for him when teachers and administrators teach concepts about sex and sexuality that contradict his understanding of sex and sexuality as derived from his parents, church community, and the Bible.

44. S.E. has attended La Costa Heights since kindergarten and recently completed his fifth-grade year. He has done well at school, academically and behaviorally.

45. S.E. served in various leadership roles at La Costa Heights this past school year. He was a mentor for students with special needs through "Teaching Independence through Differential Education" (TIDE) and served as a California native garden volunteer. Principal Kay specifically praised S.E. as an excellent tour guide and school ambassador for new students and their families.

46. S.E. has participated in the "buddy" program since kindergarten. While in fifth grade, S.E. served as a mentor for a kindergartener in the program.

### P.D.'s Sincere Religious Beliefs and School Involvement

47. Plaintiff P.D. has his own authentic Christian faith apart from his parents. He has been baptized and completed his First Reconciliation and First Communion in his family's local Catholic parish. He actively attends religious education classes, known as the Confraternity of Christian Doctrine, and his mother also teaches him at home through the family model of faith formation. P.D

is very involved in his church, attending mass every Sunday he is able.  Every summer P.D. attends the same church camp as S.E.

48.  True to his Christian faith and his understanding of biblical teaching, P.D. believes God creates humans as either male or female, and humans are not at liberty to discern or change their own gender.

49.  According to his Christian faith, P.D. also believes he is called to show respect toward authority figures, like teachers and school administrators, as well as his parents.  For this reason, it is confusing and distressing for him when teachers and administrators teach concepts about sex and sexuality that contradict biblical teaching he has received from his parents and church community.

50.  P.D. recently finished his fifth-grade year at La Costa Heights.  He has served in many leadership roles at La Costa Heights, including as a mentor for students with special needs through TIDE.  He is also active in athletics.  He has done well at school, academically and behaviorally.

51.  P.D. has been an active participant in the "buddy" program every year at La Costa Heights since kindergarten and was a mentor for a kindergartener during the 2023-24 school year.

### The School District Advances Gender Identity as Part of its Comprehensive Health Education

52.  EDC § 51210 establishes courses of study for grades 1 to 6 in California public school districts.  Among other requirements, subsection 51210(6) of EDC requires state school districts to study "[h]ealth, including instruction in the principles and practices of individual, family, and community health."

53.  The School District adopted Regulation 6142.8 to facilitate "Comprehensive Health Education" for all schools in the district.  It incorporates

the mental health of LGBTQ students in its educational goals.  Explaining the purpose for the comprehensive health education, the regulation advises the Board of Trustees "believes . . . that creating a safe, supportive, inclusive, and nonjudgemental environment is crucial in promoting healthy development of all students."

54.  School District Regulation 6142.8 contemplates a "planned, sequential, research-based, and developmentally appropriate health curriculum for students in grades K-6[,]" with the Superintendent determining subject areas and providing professional development for personnel to ensure knowledge about "academic content standards[.]"

55.  District Regulation 6142.8 expounds on a wide range of required content for "health" instruction, listing "[m]ental, emotional, and social health" among other broad subject areas, like alcohol, tobacco, and drugs, human growth, development, and sexual health, injury prevention and safety, nutrition and physical activity, as well as personal and community health, including instruction on personal hygiene and disease transmission.

56.  With each content area, District Regulation 6142.8 mandates the schools in the system design instruction and curriculum to help students "use interpersonal communication skills, decision-making skills, and goal-setting skills to enhance health."

57.  District Regulation 6142.8 specifies numerous resources for its policy on comprehensive health education, such as California School Board Association's publications on oral health, physical health, marijuana use, mental health, sun safety, and asthma management.  Another listed resource is a publication produced

by the Human Rights Campaign Foundation ("HRCF") entitled "California LGBTQ Youth Report, January 2019."[1]

58.   The HRCF Report was prepared in partnership with the California School Board Association, along with the Association of California School Administrators, California School Nurse Association, California State PTA, California Association of School Counselors, California Federation of Teachers, California Teachers Association, California Association of School Psychologists, and Equality California.

59.   The HRCF Report focuses on the mental health of LGBTQ students, claiming a significant disparity between these students and their non-LGBTQ counterparts, as well as a need to cultivate inclusive school climates to promote better mental health for LGBTQ students.

60.   Specifically addressing the need for LGBTQ inclusion in elementary schools, the HRCF Report recommends California public school districts adopt a "proactive" approach to aid the mental health of LGBTQ students, urging that "[a]ll students, especially transgender and non-binary children, need supportive school environments that affirm their identities."

61.   According to the HRCF Report, the best practices for creating a healthy school climate include the provision of "diverse books" and training for teachers on LGBTQ acceptance. In the section entitled "What You Can Do," the HRCF Report recommends, among other things, that school district leaders, school board

_____

[1] The report is available here:
https://assets2.hrc.org/files/assets/resources/YouthReport-California-Final.pdf.

13
VERIFIED COMPLAINT

members, and policy makers create district policy dedicated to supporting transgender students.

62.   District Regulation 6142.8 follows this recommendation, contemplating school curriculum that supports LGBTQ students and advances gender identity and transgenderism as part of its comprehensive health education.

### *The School District Endeavors to Promote Gender Identity to Elementary School Students through "Equity" Books*

63.   The School District maintains guidelines for supporting students who are gender diverse.  To ensure compliance, it supplies in-service training sessions for teachers and educators to make classroom and school climates more LGBTQ-inclusive environments.

64.   In these training sessions, the School District directs teachers and educators to select books for their curriculum that promote gender identity. According to District guidelines, the term "gender identity" is defined to "refer[] to a person's internal, strongly held sense of their gender [that] may or may not correspond to the sex they were assigned at birth."

65.   Assistant Superintendent Illingworth is the school official responsible for selecting curriculum for the School District. In this role, Illingworth has encouraged teachers in the District to purchase "inclusive" instructional materials focusing on LGBTQ matters.

66.   Additionally, Assistant Superintendent Illingworth is responsible for conducting numerous mandatory School District trainings for all staff on gender identity.

67.   At the mandated teacher equity trainings for the School District, school officials encourage teachers to purchase books containing so-called "equity" topics.

In a 2022 training session, Illingworth publicly expressed that one of the District's "equity" goals is to "increase representation in books and curriculum through Equity PD and curriculum audit."

68.  Illingworth applies for grants to purchase books focused on LGBTQ topics for teachers to obtain and use.  Over the last several years, the School District has given a significant monetary grant (approximately $5,000 per grant) to each school site to purchase "equity" books to "enhance representation."

69.  In October 2022, the School District gave elementary school teachers the following directive on "equity" books: "Think about some equity books you would like to purchase for your classroom.  For example, the books could go along with your social studies curriculum, they could be for read aloud, or you could purchase a classroom set.  The only caveat is that the books must be equity books. . . . I will use district equity funds to make your purchase.  These books will be the property of [the school site], but will be for your classroom, not the library."

70.  School teachers comply with this mandate by obtaining books from a list of "equity" books approved by the School District.

71.  In April 2023, the School District extended enough funding for teachers to order around twenty (20) "equity" books for each grade.

72.  Each school site creates and submits their book purchases, and the principals approve the purchases.

73.  Mr. Murphy and Ms. West attended mandatory School District staff training on equity and inclusion in spring 2023, where Illingworth praised teachers for purchasing "equity" books from the approved list, advising that LGTBQ-inclusive curriculum is necessary to encourage non-LGBTQ students to reflect on their actions and beliefs.

74.  Illingworth also expounded on the School District's intentional choice to present LGBTQ-related books to elementary school students for supposed mental health concerns.  "Kids already know at this age if they're gay!  And if they see zero representation, they think they're doing something wrong or that they're bad or evil, so we need to make sure that our representation looks like all the pieces of one person's identity . . . in the back of these slides we have the link back to our equity website and additional book resources that have books with all sorts of identity markers in it to make sure that we're finding that diversity in telling stories."

75.  At this same mandatory training, Illingworth recommended "reading a picture book and just once in a while, take out the he or she, and say they, just to get used to practicing reading something that way," in order to normalize pronoun use that conflicts with biology among elementary school students.

76.  Illingworth also contended in the session that parents should not know about gender identity instruction or programming.  She said, for any student who expresses a desire to change gender through a different name or pronoun, the school staff should develop a "gender support plan," and "the parents aren't in the plan, they never see the plan, they never know about the plan . . . I want a parent not to know."  The gender support plan is part of the District's guidelines on this subject.

77.  Illingworth claimed that students in the School District start transitioning genders as young as "Kindergarten."  "We have children who enroll in school who are already transgender and have already moved away from their sex assigned at birth and are coming to us with their new name and pronoun . . . we've had that as young as kindergarten and then these plans have K to 6, all grades."

78.  In defending School District policy of promoting LGBTQ-related books to all young children, Illingworth expressed orally and through written

training materials: "*Homophobia, heterosexism, and transphobia are present in many of our schools and communities. . . .* This bias hurts all children, both those directly affected, and those who learn in an atmosphere of fear and tension, afraid to explore their own lives because of worry about disapproval and rejection. . . . Students need to be encouraged to reflect on their own actions and friendships, learn from their peers who are different from them, and support allies who stand up to the prejudice and hate."

79.   Illingworth added in the training that "the question we get the most" is "are elementary school students too young to be introduced to this topic?" She surmised no, because children have already been introduced to information about LGBTQ topics from home, which the School District considers wrong-headed and derived from biased stereotypes.

80.   According to the School District's mandatory staff training materials, "At a very young age children have already been introduced to information about LGBTQIA+ people which is often based on misinformation and negative stereotypes. When adults are silent about LGBTQIA+ people, students learn from this omission that it is acceptable to use homophobic and transphobic putdowns. . . . Teachers are not introducing a new topic, they are helping the young students understand bias and prejudice and will learn to use respectful language."

81.   The express reason the School District pushes teachers to choose books promoting gender identity is to address "transphobia" and correct "misinformation and negative stereotypes" young children are presumably learning from their parents at home.

82. Entering the 2023-2024 school year, Mr. Murphy and Ms. West were well aware of the School District's directive to obtain "equity" books for teaching gender identity to elementary school students.

83. Both Mr. Murphy and Ms. West received consistent marketing emails promoting LGBTQ-themed books for elementary school students, including communications from the Zinn Education Project that market "Banned Books Week" and promote various "equity" books, including *My Shadow is Pink* and *My Shadow is Purple*.

84. In January 2024, School District teachers including Mr. Murphy and Ms. West were encouraged to participate in a "professional learning opportunity" focused on "how educational leaders proactively create an LGBTQ+ affirming environment for students and their parents/caregivers. . . . As educational leaders know, LGBTQ+ inclusion efforts often come with pushback and resistance. As part of the new tools covered in this session, educators will build their confidence in responding to and overcoming these common barriers to moving LGBTQ+ inclusion work forward."

85. Mr. Murphy and Ms. West planned to employ an "equity" book for the "buddy" program for the 2023-2024 school year, eventually choosing the *My Shadow is Pink* book, a picture book about gender identity.

***The School District Allows Families to Receive Notice and Opt-Out from Religiously Objectionable Instruction and Programming about Gender Identity, But Only in the Limited Context of a Health Unit***

86. Under California law, families who have religious objections to gender identity instruction and programming should receive notice and have an opportunity to opt out of it. EDC § 51240(a) provides: "If any part of the school's instruction in health conflicts with the religious training and beliefs of a parent and

18

VERIFIED COMPLAINT

guardian of a pupil, the pupil, upon written request of the parent or guardian, shall be excused from the part of the instruction that conflicts with the religious training and beliefs."

87.   However, the School District maintains a policy that prohibits opt-outs from and parental notice of religiously objectionable instruction and programming on gender identity, except in the limited context of teaching a health unit.

88.   The School District's policy adopts an extremely narrow interpretation of "instruction in health" in EDC § 51240(a), concluding that notice and an opt-out is disallowed unless religiously objectional material is presented as part of a health unit.

89.   As a result of this policy, the School District gives parents notice of gender identity instruction if it is taught as part of the fifth-grade health unit, allowing students to be excused from the full unit, but the School District will not give notice or allow opt-out of gender identity instruction presented in any other school curriculum or program.

90.   Consistent with this policy, on April 9, 2024, the School District sent out a letter to parents of fifth graders, including Plaintiff Parents, apprising them of an upcoming health unit entitled "Human Growth and Development."   This letter was authored by Maria Waskin, Executive Director, Student Services.

91.   The letter described the health unit as having lessons on "puberty, health reproduction, media influences on health habits and body image, hygiene, boundaries and bullying and diseases and their transmission, including information about HIV/AIDS."

92.   The School District further explained that this health unit would not discuss sexual intercourse.

19
VERIFIED COMPLAINT

93.  The School District also invited parents to review the content of the lessons, referencing slides found on a website link displayed in the letter.

94.  Though not mentioned in the letter, a review of the slides revealed direct teaching on gender identity and transgenderism, visually and orally depicting these subjects in ways that conflict with the religious beliefs of plaintiffs.

95.  Plaintiff Parents reviewed the slides in the link and were troubled by the School District's instruction on gender identity and transgenderism, considering the teaching an affront to their religious beliefs.

96.  The School District's letter, in addition to supplying notice of the health unit and objectionable materials, offered a mechanism for parents to opt out of the materials, which only required they advise their child's teacher of a desire to opt out.

97.  In April and May 2024, Mr. Murphy received opt-out requests from multiple parents in his fifth-grade class regarding the gender identity instruction in the health unit. He told a parent, "It's [] just if you want to opt out of the class you can email me and I will have an alternative for him to do," and told another parent, "The kids who opt out are provided with work to do in a separate space."

98.  Tom and Rebecca wished to opt out of the gender identity instruction, but not the entire unit.  Rebecca emailed Ms. Waskin, asking: "Is there an option to opt out of one or two lessons, or is it all or none?"  Ms. Waskin replied that it was a full opt-out of the entire unit, preventing parents from only opting out of objectional material.

99.  Highly concerned about the gender identity instruction in the unit, Tom and Rebecca exercised their option for P.D. to opt out, even if it meant

20
VERIFIED COMPLAINT

opting out of all of the entire unit. Rebecca emailed P.D.'s teachers requesting that he be excused.

100. Sharing the same concern, Carlos and Jenny also opted S.E. out of the health unit.

101. By utilizing the opt-out mechanism, Plaintiff Parents were able to avoid their children being exposed to religiously objectionable instruction on gender identity in the health unit.

102. Plaintiff Parents believed their use of an opt-out spared their children from instruction on gender identity that conflicted with their sincerely held religious beliefs. But unbeknownst to Plaintiff Parents, the School District would expose S.E. and P.D. to the same gender identity instruction in another school program at around the same time – and force S.E. and P.D. to affirm it.

***The School District Subjected S.E. and P.D. to Gender Identity Instruction and Required Them to Affirm Religiously Objectionable Views in a "Buddy" Program without Parental Notice or Opt-Out***

103. Every elementary school in the School District, including La Costa Heights, conducts a "buddy" program during instructional time for one class per week in the school year. During this session, older students are paired with younger students as "buddies" to spend time together and form mentoring-based relationships.

104. The "buddy" program at La Costa Heights and other elementary schools in the School District is mandatory instructional time for every grade level. Families are not afforded an opportunity to opt students in or out of the "buddy" program.

105. Both S.E. and P.D. participated in the "buddy" program at La Costa Heights as kindergarten students, and it had a significant, positive impact on them. They looked up to their "buddies" with admiration and had fond memories of the experience.

106. S.E and P.D. were part of the "buddy" program in other grades at La Costa Heights too, including the fifth grade, when they both served as mentors. They fully understood the influence they had on the younger buddy students, taking on a "big brother" role to them for the school year, building trust and strong relationships with them.

107. Mr. Murphy, as a fifth-grade teacher, and Ms. West, as a kindergarten teacher, worked together on the "buddy" program for their respective grades, pairing up students as buddies.

108. For the 2023-2034 school year, S.E. and P.D. participated in the buddy program every Wednesday, beginning at 8:00 a.m. S.E was paired with a kindergarten buddy, as was P.D.

109. S.E. and P.D. met up with their buddies every Wednesday for some kind of informal activity, allowing the buddies to get to know each other and build a relationship with each other.

110. Getting together with their kindergarten buddies on a regular basis throughout the school year, S.E. and P.D. had formed tight bonds with them.

111. Toward the end of the school year, with the buddy relationships in place and well established, Mr. Murphy and Ms. West planned a unique event for May 1, 2024. During this "buddy" program, the District would use fifth graders to help kindergarteners learn about gender identity.

112.  On April 30, Mr. Murphy texted Ms. West, asking if her class had read the book "My Shadow is Pink."  Ms. West responded, "I just looked it up and watched the short film it's sooooo sweet! We could have the big buddy trace the littles shadow and then they add to it after?" Mr. Murphy responded, "Exactly what I was thinking. . . Also have a little page they can do together before they trace their outline . . . so we can read that together (show the video) then have them [d]o that activity."

113.  Ms. West agreed to the plan with, "love the overall message," "Yep we have chalk," and, "We might just inspire some sweet things to fly toward their shadow tomorrow."

114.  Utilizing the *Shadow is Pink* book and associated activity for the "buddy" program, Mr. Murphy and Ms. West were following School District policy and directives from mandatory training to teach younger students about gender identity through an "equity" book.

115.  *My Shadow is Pink* is an "equity" book among the books approved by the School District.  On information and belief, La Costa Heights obtained the book for Mr. Murphy and Ms. West through "equity" funds received from the School District.

116.  In *My Shadow is Pink*, a young biological boy wonders about his gender and how he believes it differentiates from his father's gender, commenting how he "loves wearing dresses and dancing around," and "loves. . . pink toys, princesses, fairies, and things not for boys."  The book depicts an ensuing conflict between the boy and his father over this questioning, as the father "walks in [the room] with a glare" and refers to his son's gender identity as "just a phase."

117. The book resolves the conflict by showing the father abandoning his prior beliefs. While the dad is initially "anxious and stressed" when the boy wears a dress to school, he decides to wear a dress too, "with shimmering seams and pink sparkling hoods," after his son had a difficult day at school. The father tells the child to "pick up that dress! Your shadow is pink. I see now it's true. It's not just a shadow, it's your inner-most you." And the story ends with the father advising his child, "So put on that dress and get back to school; if someone won't like you then they are the fool."

118. As a rhyming picture book, *My Shadow is Pink* is not geared toward fifth graders, being well below their reading level, using words, sentences, and graphics more suitable for far younger audiences. Excerpts from the book are as follows:






119. The *My Shadow is Pink* book was not mentioned in any book list published to fifth graders or their parents for the school year.

120. Though La Costa Heights and the teachers advised parents about the "buddy" program, they never notified parents that *My Shadow is Pink* would be used in the "buddy" program. In fact, Mr. Murphy omitted the book and activity from his weekly newsletter to parents.

121. On the day of this special "buddy" program, at 8:00 a.m. on Wednesday, May 1, 2024, Mr. Murphy pulled out *My Shadow is Pink* and read the book aloud to S.E., P.D., and other fifth graders in the class. The reading was unusual. It was rare for Mr. Murphy to read any book to them, and he had never read a book to them for the "buddy" program.

122. S.E. and P.D. listened to Mr. Murphy's reading of *My Shadow is Pink*, which was their introduction to the book.

123. They were both immediately concerned about the gender identity messaging in the book. S.E. and P.D. strongly disagreed with the point of the book on religious grounds, taking issue with the proposition that gender is a choice that can change, as portrayed in the book.

124. Right after his reading, Mr. Murphy directed S.E., P.D. and the other fifth graders to go meet up with their kindergarten buddies as part of the "buddy" program, leaving S.E. and P.D. with no time to consult with their parents about their concerns or give it much thought.

125. Mr. Murphy and Ms. West arranged for their combined classes of fifth graders and kindergarteners to watch a read-along video of *My Shadow is Pink* together.[2]

126. After meeting up with the kindergarteners, P.D. realized his buddy was absent, so S.E. and P.D. shared the same buddy that day.

127. S.E. and P.D. were directed to sit next to their kindergarten buddy and watch the read-along video about *My Shadow is Pink* with him. Though S.E. and P.D. were bothered about kindergarteners watching that video, they were afraid of speaking up about it. They did not want to get in trouble and knew of no way to get excused from it.

128. The video tracked the *My Shadow is Pink* book, but presented the message of the book in a way that kindergarteners could comprehend, using music and graphics designed to capture their attention.

129. Following the video presentation, the teachers told S.E. and P.D. to go outside with their buddy to jointly participate in a chalking activity. The teachers asked all kindergarten students, including S.E. and P.D.'s buddy, to "pick a color that represents you."

_____

[2] This read-along video that S.E. and P.D. watched with their "buddies" is available here: https://www.youtube.com/watch?v=tEnOdHNQYV8&ab_channel=AmebaProductionsandDistribution.

130. S.E. and P.D. were compelled to make their kindergarten buddy choose a color and tell them the color he chose for his shadow, representing his gender identity. The inquiry presupposed S.E. and P.D. believed people can have a personal sense of their own gender.

131. S.E. and P.D. were also forced to trace and fill in their buddy's shadow on the pavement with sidewalk chalk using the color chosen by their buddy to "represent" his gender identity.

132. S.E. and P.D. were both disturbed by the series of events promoting gender identity in the "buddy" program. The book, the video, and the activity all conflicted with their religious beliefs. They believe God and biology determines gender, not internal feelings. And they thought it was especially inappropriate to compel them to be a mouthpiece for the School District and foist that messaging on vulnerable kindergarteners.

133. Despite their earnest religious beliefs, S.E. and P.D. had no choice but to participate in all aspects of the *My Shadow is Pink* "buddy" program that day. They did not want to read the book or watch the video, nor betray their conscience by affirming the idea that gender identity is internal and can change. While the video was playing, S.E. wanted to cover his buddy's eyes and ears to protect him.

134. S.E. and P.D. were especially bothered that they had to push the idea that individuals can select their own gender to a kindergartener, knowing this kindergarten buddy looks up to them as role models and trusts their opinions.

135. S.E. and P.D. believed their participation in the *My Shadow is Pink* "buddy" program, making their buddy choose a color representing their gender and drawing the buddy's shadow in that chosen color on the sidewalk, communicated

27
VERIFIED COMPLAINT

to their buddy that they believed gender was determined by an internal feeling – despite their religious beliefs to the contrary.

136. When S.E. left school that day, he was deeply troubled by what happened to P.D., his kindergarten buddy, and him. After school, on the way to a dental appointment, he told his father Carlos about the *My Shadow is Pink* book, listening to Mr. Murphy read the book, watching the video with their kindergarten buddy, and drawing the gender identity shadow, describing to his father how upsetting these activities were for him.

137. S.E. told his parents he was upset and confused that Mr. Murphy, a teacher he likes and respects, used a book for the "buddy" program that Mr. Murphy knew went against his Christian beliefs and used him to convey this troubling message to a kindergartener. S.E. hoped his buddy would not understand the real meaning of the activity or the teaching on gender identity.

138. P.D. expressed the same distress to his parents that day. He did not want to hear a reading of that book. He did not want kindergarteners watching the video. He did not want to participate in the activity in any respect, but had no advance notice or ability to opt out.

139. The blatant promotion of gender identity in the *My Shadow is Pink* book is self-evident and obvious. The book is marketed as "a rhyming story that touches on the subjects of gender identity, equality, and diversity."

140. S.E.'s father Carlos and mother Jenny were shocked when they learned about the activities involving the *My Shadow is Pink* book. They could not believe the School District read the book to S.E. and forced him to participate in an activity affirming the book with his kindergarten buddy without giving them notice and

opportunity to opt out of this exercise that clearly conflicted with their religious beliefs.

141. Carlos reached out to Mr. Murphy to obtain an explanation about the situation. He informed Mr. Murphy that the content of the book made S.E., and several of his friends, like P.D., very uncomfortable, and asked for more details about the book. He asked Mr. Murphy why he would instruct S.E. to read a book about gender identity with a kindergarten student who looks up to him. In his communication, Carlos made clear that he and Jenny expected the School District to seek their approval for material containing sexual content.

142. Mr. Murphy responded, admitting that he "read [the book] to the class and then with their buddies they chalked what color their shadow would be and they got to pick any color they wanted." He acknowledged that "the book is about a kid who feels like his shadow is pink and is embarrassed about this because he thinks his shadow needs to be the same as his dad's (blue)."

143. Carlos was upset the School District would secretly teach and require his son to affirm a view about gender identity contrary to their religious beliefs.

144. Carlos wrote Mr. Murphy back and shared his belief that the book was inappropriately focused on gender identity. He asked who chose the book and why it was presented. From his research, he knew the book was promoted by LGBTQ+ communities. Carlos did not believe the book was appropriate for elementary-aged children.

145. Mr. Murphy confirmed that he chose the *My Shadow is Pink* book. He attempted to defend his choice of the book and having fifth graders share it with kindergarteners, claiming "as an educator it is [his] responsibility to do [his] best to represent everyone in our school."

***Superintendent Grey and Principal Kay Dismiss Plaintiff Parents' Concerns about Inability to Opt Out from Gender Identity Instruction and Forced Affirmation of School District's Viewpoint***

146. The day following the *My Shadow is Pink* "buddy" program, on May 2, 2024, S.E. and P.D. noticed Mr. Murphy had placed the *My Shadow is Pink* book on the ledge of the dry eraser board, a prominent place where everyone could see it, serving as a constant reminder of the gender identity exercise.

147. S.E. also noticed a copy of a *My Shadow is Purple* book sitting on Mr. Murphy's desk. This is a book written by the same author as *My Shadow is Pink*, likewise promoting views on gender diversity contrary to S.E.'s religious beliefs. S.E. was scared Mr. Murphy would use this book for the next "buddy" program.

148. P.D. and S.E. told their parents what they saw in Mr. Murphy's classroom.

149. Bothered by what happened to S.E. with the *My Shadow is Pink* exercise, Carlos and Jenny were further troubled by the prospect of something like this happening to S.E. and the other children again.

150. On May 8, 2024, Carlos called Principal Kay to see how they could avoid another occurrence. Not reaching her, he left a voice message for her.

151. This same day, May 8, 2024, Carlos and Jenny emailed Superintendent Grey to express their concerns in hopes of obtaining relief. They advised Superintendent Grey that S.E. was very upset about the *My Shadow is Pink* book and associated activity with his kindergarten buddy. They explained the book went against S.E.'s religious convictions and was inappropriate for his kindergarten buddy.

152. Carlos and Jenny complained the book choice failed to take into account how the teaching would impact children with Christian upbringings like S.E., adding that S.E. was confused and anxious because he had always trusted his teacher.

Carlos and Jenny asked why the School District hid the *My Shadow is Pink* book and activity from parents. They expressed their disappointment in the lack of notice and opportunity to opt out of the exercise.

153. In a follow-up email the next day, May 9, 2024, Jenny advised of backlash, hostility, and threats they and S.E. were receiving from many in the school community for speaking out against the *My Shadow is Pink* book exercise and the need for the School District to protect their children.

154. That day, May 9, 2024, Superintendent Grey and Principal Kay responded to the emails from Carlos and Jenny. They explained that the School District policy on parental notice and opt-outs for religiously objectionable health curriculum would not be changed unless the state legislature required them to take this step, suggesting Carlos and Jenny speak to their elected representatives about the issue.

155. The Does' concerns similarly fell on deaf ears. On May 9, 2024, Rebecca Doe emailed Principal Kay, Superintendent Grey, and Mr. Murphy, expressing that while he had been an excellent teacher for her child, the book Mr. Murphy chose to use for the "buddy" program was unacceptable. She observed that young children are literal in their thinking and the book could cause a lot of confusion for them. Rebecca also conveyed her concern that those in disagreement with the *My Shadow is Pink* book were subjected to hatred, shame tactics, and mischaracterizations.

156. Principal Kay emailed the Does back that same day but did not directly address Rebecca's concerns. She referenced a letter she planned to send out to the school community bemoaning recent divisiveness that had arisen over the book. She did not offer any further response.

157.  On May 13, 2024, Carlos called Principal Kay again, left a voicemail, emailed, and offered to come by her office.  Principal Kay finally returned Carlos's telephone call and they spoke for approximately 35 minutes.  Carlos reiterated his worries and asked Principal Kay how they could avoid the school teaching its views on gender identity to S.E. in the future.  Principal Kay responded the Encinas family could not and would not avoid gender identity instruction.  She made clear that religiously objectionable curriculum on gender identity could and would appear again in La Costa Heights' instruction and programming, emphasizing the school would not offer opt-outs from or notice of the objectionable curriculum.

158.  After explaining to Principal Kay how harmful the *My Shadow is Pink* exercise was for S.E., he asked her if the school would handle the matter differently in the future.  To his dismay, the principal responded the school would not change its approach.

159.  Carlos inquired why they could opt out of gender identity instruction when presented as part of a health unit but could not opt out of gender identity instruction in other kinds of curriculum like the buddy program. The principal did not provide a direct answer, vaguely suggesting he take the issue up with the state legislature.

160.  Principal Kay also defended the *My Shadow is Pink* book and its use in the "buddy" program.  She said teachers have discretion to choose approved equity books, remarking that La Costa Heights was obliged to support other members of the school community with the curriculum, referencing gender diverse students.

***The School Board Dismisses Plaintiff Parents' Concerns about
Gender Identity Instruction and Affirmation***

161.  The Encinas and Doe families were troubled by the stance articulated by Mr. Murphy, Principal Kay, and Superintendent Grey about gender identity instruction and the refusal to allow opt-outs.  They decided to take their grievances directly to the School Board for the School District.

162.  The first regular meeting of the Encinitas Union School District Board following the *My Shadow is Pink* "buddy" program took place in the District office on May 21, 2024.  This board meeting allowed for general public comments, and Carlos and Tom planned to be there to let their concerns be known.

163.  The board meeting was well-attended that day, with all seats in the facility taken.  Hundreds of concerned parents were turned away and had to remain in the parking lot.

164.  Both Carlos and Tom arrived early and were able to get into the facility, but the first several rows of seats were reserved for unionized teachers wearing matching t-shirts that stated "Choose to Include."

165.  Public comments lasted over two hours.  Many speakers strayed from the issue at hand relating to notice and opt-outs, and commented on the propriety of transgenderism generally, safety concerns surrounding LGBTQ students, and other tangential matters.

166.  In his comment, Carlos addressed the *My Shadow is Pink* book and spoke about the need for parents to have notification and opt-outs from gender identity or other religiously objectionable curriculum. Tom spoke as well, asked for opt-outs, and discussed the District's lack of responsiveness to parental concerns.

167. Several other parents and community members spoke against the *My Shadow is Pink* book and exercise and urged the School District to provide notice and opt-outs of religiously objectionable curriculum supporting gender identity and transgenderism.

168. One parent spoke about the need to consider the beliefs and feelings of children like S.E. "I'm here for Carlos and his son . . . . I wanted to speak to who supported Carlos's son when he felt uncomfortable reading this content to a kindergartener? He was too afraid to speak to the teachers and speak against it. Where were the considerations for his inclusion?"

169. Another parent asked the School District adopt a policy to notify parents and gain consent from each student's parents prior to exposing them to divisive or controversial curriculum, such as that promoting LGBTQ issues.

170. Additionally, a classroom teacher in the School District shared her apprehensions about gender identity teachings in elementary school classrooms and the pressure the School District was applying to teachers to support transgenderism. "I've been to all the mandated teacher equity trainings, and in these trainings, teachers were not only encouraged, but given free reign and money to purchase books with controversial subject matter. We don't all agree with that." She added: "The District introduced gender ideology to all teachers and told them it was ok for them to read these types of books, no age limit.  Many teachers do not agree with this.  Again, they're not going to come here and speak, because they're afraid. . . . We all need to protect our children's innocence.  Parents know their children better than anyone.  Each family is entitled to their own values, and I ask that you respect all families' values and keep controversial topics out of the classroom."

171. Other teachers spoke, offering a contrary view, emphasizing their commitment to advancing gender identity in the schools.

172. During the meeting, the School Board did not indicate any willingness to reconsider its policy of disallowing notice and opt-outs for religiously objectionable curriculum dealing with gender identity outside of health unit. It never put the issue on the board agenda or publicly spoke about the issue.

173. Both before and after the school board meeting, at least 23 parents sent emails to Superintendent Grey, Principal Kay, Mr. Murphy and Ms. West, and other School District officials, expressing serious concerns about the *My Shadow is Pink* book and activity, and requesting future notice and opt-outs. Several of these parents had children in either the kindergarten class or the fifth-grade class that did the activity.

174. In these emails, many parents expressed their concerns were rooted in their religious beliefs. For example, a family identifying themselves as Jewish expressed that they would "like to confirm that our teachers are being transparent with us about what is being read and taught to our children . . . . we would be very upset and surprised if books or any curriculum was geared towards indoctrinating our children in any fashion."

175. Soon after the controversy about the *My Shadow is Pink* book began, two other parents at La Costa Heights started a petition on Change.org, called "Parental Opt-in for Controversial Curriculum in Encinitas Union School District." This petition secured 546 signatures, including that of the Encinases and Does.

176. The petition called on the School District to implement a policy requiring parental consent before exposing students to any divisive and

controversial curriculum, including gender identity and other LGBTQ-oriented curriculum.

177.  The School District never responded to the petition or any of the concerns set out in the petition.

178.  On May 28, Superintendent Grey emailed to the School Board a "sample response that I will sending regarding the inquiry after last week's meeting."  This template letter described the District's restrictive position on opt-outs.

### *The School District Denies the Encinases and Does' Formal Requests to Opt Out of Objectionable Curriculum on Gender Identity*

179.  Following his telephone conversation with Principal Kay, Carlos reviewed pertinent California education laws and was reminded of EDC § 51420. From his review, he surmised that an opt-out as envisioned in that law was applicable for future teachings of gender identity and other LGBTQ topics.

180.  He and Jenny believed the requirement for notice and an opt-out for health instruction applied to *My Shadow is Pink*, *My Shadow is Purple*, and similar "equity" books that La Costa Heights could offer in the future as part of the "buddy" program or through other curriculum.

181.  On May 17, 2024, Carlos emailed Principal Kay an opt-out form he and Jenny filled out for S.E. and their other child at La Costa Heights.

182.  In the opt-out request, the Encinases checked the box for EDC § 51240, as well as some others.  Regarding EDC § 51420, they specified a desire to opt out of curriculum concerning "sex, family life, morality, religion, gender identity."

183.  Regarding this request for an opt-out, on May 22, 2024, the School District, through Superintendent Grey, responded to the Encinases by letter and denied their request, using the template.

36

184.  Two days before Superintendent Grey sent the letter to the Encinases, she asked Principal Kay and Assistant Superintendent Illingworth to "review/edit the attached draft letter" and also planned to "review and discuss with Christie and Amy I. prior to sending it."

185.  In the letter, the School District acknowledged the concern over the *My Shadow is Pink* book, but in denying the request, the District apprised Carlos and Jenny of its position that the notice and opt-out under § 51240 only applied to "instruction in health," meaning only in the fifth-grade health unit.

186.  The School District did not explain in the letter how it reached this conclusion.

187.  The Encinases were perplexed by the response and disagreed with the reasoning.  They did not understand why notice and opt-out of gender identity instruction is provided solely when offered as part of a health unit.

188.  The Encinases shared the School District's response with the Does and other concerned parents.

189.  The Does also believed the School District's conclusion was faulty.

190.  Another parent wrote to Superintendent Grey, pointing out the error. She states: "While the law does not expressly mandate a specific provision for parents uncomfortable with certain curriculum components, it is important to note that it also *does not prohibit* school districts from accommodating parental requests regarding curriculum opt-in/opt-out options. . . . EUSD is actively disregarding parental and community concerns by introducing controversial ideologies and discussions about sexuality to our students aged 5 to 11.  Despite the absence of any state or federal mandates requiring EUSD to take this approach, there are

constitutional safeguards in place to protect parental rights." The School District did not respond.

191. Neither Superintendent Grey nor anyone affiliated with the School District responded to the Does' concerns expressed at the Board Meeting.

192. Having not heard from the School District, the Does presumed a request for notice and opt-out from curriculum advancing gender identity and transgenderism would be denied.

193. Notwithstanding, on July 26, 2024, the Does submitted a formal request for an opt-out. They checked the box pertaining to opt-out for health instruction as set out in EDC § 51240, specifying gender identity as one of the sources of concern.

194. A few days later, on July 30, 2024, the Does received a response denying the request from Superintendent Grey, on behalf of the School District. This response was nearly identical to the response Superintendent Grey sent to the Encinases, except for proper names, and the addition of the chilling line, "students must participate in the District's curriculum."

***The School District Provides Notice and Allows for Opt-Outs in Other Scenarios***

195. While the School District denied the Encinases and Does' requests for notice and opt-outs from curriculum involving gender identity, it permits opt-outs for a range of topics that fall within the District's broad understanding of comprehensive health education.

196. If gender identity is taught as part of a health unit, like the one offered in May 2024, the School District provides notice and an option for opt-outs.

197. The School District also allows opt-outs from many other instructional activities as well, such as Farm Lab, an off-site student experience.

While the District has publicly stated that "all fourth-graders participate," it allows opt-outs for any family for any reason.

198.  Further, the School District extends an opportunity for parents to opt their students out of certain elements of TRAC (Teamwork, Regulation, Acceptance and Community).  While students cannot opt out of weekly social-emotional learning instruction, certain activities focused on conflict resolution and behavioral management require parental notice and approval.

199.  Other educational activities require parental opt-in through the use of permission slips, such as an after-school art program and a "Study Buddy club" where elementary school students are paired with teens for academic support.

200.  Mr. Murphy and other teachers regularly facilitate opt-outs as part of the school day.  For example, in February 2024 Mr. Murphy sent a "permission slip for the California Healthy Kids survey.  You have the option to opt in or opt out of the survey."

201.  Teachers have discretion to allow additional opt-outs from certain lessons and curricular activities.  For example, a third-grade teacher notified her families that an additional spelling packet "will be sent home" and "[i]t is up to you and your child to decide if they will be challenging themselves . . . [t]hey may opt out if that is what you decide."

202.  The School District further allows opt-outs as directed by state law, including from standardized testing, student surveys, doctor examiniations, and animal dissections for students with moral objections.  These opt-outs are attributable to the School District as an agency for the state.

### *The Harmful and Lingering Effects of Gender Identity Instruction and Programming Without Opt-Outs or Notice*

203. S.E. was shocked and disturbed when Mr. Murphy, his fifth-grade teacher, read aloud the *My Shadow is Pink* book to him and the rest of his class. The content of the book contradicts S.E.'s religious beliefs and those of his family. He was deeply offended by the reading.

204. The reading of the book was made worse coming from Mr. Murphy. S.E. likes Mr. Murphy, one of his favorite teachers at the school. He trusted Mr. Murphy. Yet Mr. Murphy, knowing S.E. and other students in his classroom are Christians, presented the message of the book as morally right and the only appropriate way to view gender. To S.E., it seemed like Mr. Murphy was teaching that his religion is wrong, his beliefs are repugnant, and that he ought to be ashamed for having these beliefs.

205. S.E. was further and especially troubled by the *My Shadow is Pink* exercise that followed with the "buddy" program. He had built a relationship with his kindergarten buddy over the course of the school year, valued this relationship, and did not want to do anything that could harm or confuse him.

206. For this reason, S.E. did not want to tell his "buddy" that he could choose his own gender. S.E. believes this idea is false, that it contradicts teachings of the Bible, and can cause serious harm to people, but S.E. was forced to affirm this concept to his buddy by watching the read-along *My Shadow is Pink* video with him, asking his buddy to choose a color to represent his gender, and chalking out that choice with him. S.E. felt like he was forced to betray the trust of someone whom he cares for very much.

207. The exposure to the religiously objectionable messaging and compulsion to affirm and communicate that messaging to someone else violated

40

S.E.'s fundamental constitutional rights. It also caused S.E. to suffer a great deal of mental anguish, and to lose sleep.

208. The events of this day also harmed S.E.'s parents, Carlos and Jenny. They were upset to learn what happened to S.E. at school. The School District grossly interfered with the religious upbringing of their child. School officials evinced hostility toward their religion and their religious beliefs about gender identity specifically.

209. Failing to give the Encinases notice of and an opportunity to opt out of this objectionable activity adversely affecting their son S.E. violated their fundamental constitutional rights.

210. Also, the School District's and school officials' refusal to allow for notice and opt-out of future gender identity instruction and curriculum, including that presented in the "buddy" program, posed a likelihood of significant harm for Carlos and Jenny, as well as S.E. They consider the real prospect of the school subjecting S.E. to religiously objectionable teaching without their knowledge again untenable.

211. For this reason, and because of the backlash, hostility, threats and mistreatment Carlos, Jenny, S.E., and their younger child have received from many in the school community for raising their concerns, Carlos and Jenny made the difficult choice to withdraw their children out of La Costa Heights in August 2024, and place them at a private school at a significant financial and relational cost to them.

212. P.D. was also directly and significantly affected by the events described herein. He could not believe Mr. Murphy, a teacher whom he loved and respected, read the *My Shadow is Pink* book and promoted the ideas in that book

to the class as though no good person could see the transgender issue in any other light.  The presentation made P.D. feel like Mr. Murphy was saying he is a bad kid for believing the way he does.

213.  P.D. was also troubled by the compulsion to go along with this idea that goes against his faith, by watching the video with a kindergartener, asking him to pick a color representing his gender, and chalking out the choice.  The exercise upset him very much.   P.D. felt like they were causing the kindergarteners significant harm and confusion with this exercise.

214.  Hearing the messaging of the book and having to repeat this messaging to kindergarteners troubled P.D. immensely.   The exposure and compulsion violated his fundamental constitutional rights.  He also suffered mental anguish, and lost sleep.

215.  The activity surrounding the *My Shadow is Pink* book caused harm to P.D.'s parents, Tom and Rebecca Doe, as well.  As Christians, the Does were alarmed and distressed over the way the school exposed and forced their child to affirm a book espousing beliefs contrary to their religion without them knowing about it.

216.  The teaching and required affirmance of *My Shadow is Pink* directly interferes with their upbringing of P.D. and what they teach P.D. at home.  The activity violated the Does' fundamental constitutional rights.

217.  The Does are also concerned about future harm to P.D. and their family.  The School District denied their request to opt out of gender identity instruction.

218.  With P.D. attending the same school in the sixth grade, his class is already paired with a first-grade class for the "buddy" program during the 2024-25

42

VERIFIED COMPLAINT

school year, and they meet every week during the school day.  His sibling's class is also paired with another class for the "buddy" program.

219.  Thus, the Does fear that something akin to *My Shadow is Pink* "buddy" program will occur again, harming their child, interfering their parental rights.  And like the *My Shadow is Pink* exercise, it will happen without their knowledge, keeping them from being able to do anything about it.

220.  The policy and practice providing gender identity curriculum to P.D. without giving the Does notice or opportunity to opt out of religiously objectionable instruction and programming presents a threat to P.D. and the Does' constitutional rights and causes them to suffer irreparable injury.

221.  There is no adequate remedy at law that can correct the persistent deprivations of Does' constitutional liberties.

**FIRST CAUSE OF ACTION**
**Violation of the First Amendment and Fourteenth Amendments:**
**Free Speech Clause, Compelled Speech**
**42 U.S.C. § 1983**

222.  Plaintiffs hereby incorporate and re-allege all preceding paragraphs.

223.  Plaintiffs S.E. and P.D. bring this cause of action against the School District's Board Members in their official capacities, and against Defendants Grey, Illingworth, Kay, Murphy, and West, in their individual and official capacities, as is set forth more fully below.

224.  The government cannot compel citizens to speak or affirm messages that violate their sincerely held religious beliefs or consciences.

225.  This principle applies in the public school context. School officials

43
VERIFIED COMPLAINT

may not compel children to affirm or speak messages that violate their sincerely held religious beliefs or consciences.

226.  Defendants violated the free speech clause of the First Amendment by compelling S.E. and P.D. and other elementary age students to actively participate in the *My Shadow is Pink* activity and affirm gender identity in action and word in violation of their religious beliefs and consciences.

227.  Plaintiffs S.E. and P.D. were not afforded an opportunity to opt out of this required instructional activity.  Nor was it a passive experience; they had to actively participate in teaching kindergarteners about questioning, discerning, and proclaiming their own gender identity.

228.  For the upcoming school year, which began August 13, 2024, P.D. has a well-founded fear the School District will continue violating his constitutional rights.

229.  Defendants therefore violated the free speech clause of the First Amendment to the U.S. Constitution, made applicable to the states through the Fourteenth Amendment.

**SECOND CAUSE OF ACTION**
**Violation of the First and Fourteenth Amendments:**
**Free Exercise Clause**
**42 U.S.C. § 1983**

230.  Plaintiffs hereby incorporate and re-allege all preceding paragraphs.

231.  Plaintiffs bring this cause of action against the School District's Board Members in their official capacities, and against Defendants Grey, Illingworth,

Kay, Murphy, and West, in their individual and official capacities, as is set forth more fully below.

232. Plaintiffs maintain sincere religious beliefs regarding biological sex and gender identity.

233. The government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs.

234. The government cannot impose regulations that are hostile to the religious beliefs of affected citizens.

235. Defendants' policy and practice are hostile toward religion, denying religious parents advance notice and opt-out despite state law allowing advance notice and opt-out for religious objectors to the curriculum.

236. Defendants' policy and practice are also not generally applicable, allowing various other opt-outs from curriculum.

237. The School District allows for opt-outs for religiously objectionable instruction and material in a health unit, but not in other teaching contexts.

238. A government policy or practice is also not neutral and generally applicable when it treats secular conduct more favorably than religious exercise. By allowing a wide range of opt-outs for other reasons and in other contexts, but not for plaintiffs' religious beliefs, the School District treats non-religious concerns more favorably than religious concerns.

239. School District officials exercise discretion to allows opt-out from numerous educational activities and instruction, including but not limited to Farm Lab, field trips, and TRAC social emotional learning lessons while refusing to allow opt-outs from instruction about gender identity when parents request it for religious reasons.

240. Because the School District's practice is not neutral or generally applicable, strict scrutiny applies, which requires the government to show it is using the least restrictive means to pursue a compelling interest.

241. The School District cannot assert a compelling interest in forcing these specific plaintiffs to participate in activities that violate their faith.

242. Even if Defendants can specify a compelling interest of some kind, forcing religious students to read books, participate in activities, and speak messages that violate their consciences and sincerely held religious beliefs cannot be the least restrictive means of pursuing any such interest.

243. For the new school year begun in August 2024, Plaintiffs P.D. and the Does have a well-founded fear Defendants will continue violating their constitutional rights.

244. Defendants therefore violate the free exercise of religion clause of the First Amendment to the U.S. Constitution, made applicable to the states under the Fourteenth Amendment.

### THIRD CAUSE OF ACTION
#### Violation of the First and Fourteenth Amendments:
#### Free Exercise Clause, Religious Upbringing of Children
#### 42 U.S.C. § 1983

245. Plaintiffs hereby incorporate and re-allege all preceding paragraphs.

246. Plaintiffs Carlos Encinas, Jennifer Encinas, Tom Doe, and Rebecca Doe bring this cause of action against the School District's Board Members in their official capacities, and against Defendants Grey, Illingworth, Kay, Murphy, and West, in both their individual and official capacities, as is set forth more fully below.

46
VERIFIED COMPLAINT

247. The free exercise clause of the First Amendment protects parents' freedom to direct their children's education and their ability to impart their sincere religious beliefs to their children without government interference.

248. By denying Plaintiff Parents' requests for advance notice and opt-outs from teaching that violates their Christian faith, and by insisting that religious children participate in activities that promote gender identity in violation of their faith, the School District is willfully disregarding and violating their First Amendment right to direct the religious upbringing of their children.

249. Defendants have no compelling or legitimate reason justifying the infringement on religious beliefs.

250. Defendants therefore violate the free exercise of religion clause of the First Amendment to the U.S. Constitution, made applicable to the states under the Fourteenth Amendment.

## FOURTH CAUSE OF ACTION
### Violation of the Fourteenth Amendment:
### Substantive Due Process, Parental Rights
### 42 U.S.C. § 1983

251. Plaintiffs hereby incorporate and re-allege all preceding paragraphs.

252. Plaintiffs Carlos Encinas, Jennifer Encinas, Tom Doe, and Rebecca Doe bring this cause of action against the School District's Board Members in their official capacities, and against Defendants Grey, Illingworth, Kay, Murphy, and West, in both their individual and official capacities, as is set forth more fully below.

253. The due process clause provides heightened protection against government interference with certain fundamental rights and liberty interests.

47
VERIFIED COMPLAINT

254. Plaintiff Parents have a fundamental liberty interest to direct the upbringing of the children.

255. Defendants interfere with Plaintiff Parents' fundamental liberty interest by exposing their children to instruction and programming contrary to their sincere religious beliefs and failing to provide advance notice and the opportunity to opt out of the objectionable curriculum.

256. Defendants' policy and practice violates Plaintiff Parents' right to substantive due process of the Fourteenth Amendment to the U.S. Constitution by denying requests for notice and opt-out from instructional material relating to gender identity that violates their sincerely held religious beliefs.

## FIFTH CAUSE OF ACTION
### Violation of the Fourteenth Amendment:
### Procedural Due Process
### 42 U.S.C. § 1983

257. Plaintiffs hereby incorporate and re-allege all preceding paragraphs.

258. Plaintiffs Carlos Encinas, Jennifer Encinas, Tom Doe, and Rebecca Doe bring this cause of action against the School District's Board Members in their official capacities, and against Defendants Grey, Illingworth, Kay, Murphy, and West, in both their individual and official capacities, as is set forth more fully below.

259. Under the Due Process Clause of the Fourteenth Amendment, "No State shall ... deprive any person of life, liberty, or property, without due process of law."

48
VERIFIED COMPLAINT

260. Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the due process clause of the Fourteenth Amendment.

261. Plaintiff Parents have a liberty interest in the ability to raise their children without undue interference from the government.

262. The School District's comprehensive health education includes instruction on gender identity.

263. The School District recognizes a parental right to opt out of health curriculum, including gender identity instruction, as set out in EDC § 51240, but only in a limited context. It maintains an arbitrary policy of allowing opt-outs for gender identity curriculum in health units while denying opt-outs for gender identity curriculum in other units or programming.

264. The School District interferes with Plaintiff Parents' ability to raise their children through an arbitrary reading and application of state law.

265. Thus, the School District's strained interpretation and prohibitive policy deprives the Plaintiff Parents of a liberty right without notice, resulting in a violation of their procedural due process under the Fourteenth Amendment to the U.S. Constitution.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a. Enter a declaration that forcing Plaintiffs S.E. and P.D., against their religious or moral beliefs, to read, listen to, discuss, write about, affirm and/or participate in activities or books about gender identity violated Plaintiffs' rights under the Free Exercise Clause and Free Speech Clause of the First Amendment;

b. Enter a declaration that failing to afford Plaintiffs a right to opt out from forced reading and activities about the School District's books about gender identity violated the Free Exercise Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment;

c. Enter preliminary and permanent injunctions prohibiting the School District from forcing P.D. and other students—over the objection of their parents—to read, listen to, discuss, or write about, affirm and/or participate in activities or books about gender identity;

d. Enter preliminary and permanent injunctions prohibiting Defendants from forcing minor children to speak or affirm messages through "equity" books that violate their moral conscience or sincerely held religious beliefs;

e. Enter preliminary and permanent injunctions requiring the School District to provide to the Does and other parents advance notice and an opportunity to opt out of curriculum, activities, or any other instruction related to gender identity or other LGBTQ topics.

f. Award nominal damages to all Plaintiffs;

g. Award damages for mental and emotional distress and anguish caused to all Plaintiffs;

h. Award attorneys' fees and costs under 42 U.S.C. § 1988; and

i. Award such other relief as the Court may deem just and proper.

Respectfully submitted this 10th day of September 2024.

By: _/s/*Dean R. Broyles*_____
Dean R. Broyles, SBN 179535
The National Center for Law & Policy
539 West Grand Avenue
Escondido, California 92025
(760) 747-4529
dbroyles@nclplaw.org

Robert J. Reynolds, SBN 151243
Law Office of Robert J. Reynolds
16950 Via de Santa Fe, Suite 5060-145
Rancho Santa Fe, CA 92091
619-261-3393
rjrsdesk@yahoo.com


FIRST LIBERTY INSTITUTE
David J. Hacker, SBN 249272
dhacker@firstliberty.org
Nathan W. Kellum, *pro hac vice*\*
nkellum@firstliberty.org
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy, Suite 1600
Plano, TX 75075

Kayla A. Toney, *pro hac vice*\*
ktoney@firstliberty.org
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW Suite 1410
Washington, DC 20004
(202) 918-1554
\*Applications forthcoming

*Attorneys for Plaintiffs*

51
VERIFIED COMPLAINT

1

## <u>VERIFICATION</u>

2

3

4

I, Carlos Encinas, have reviewed the foregoing Verified Complaint and verify under penalty of perjury that it is true and correct.

5

6

Executed in Carlsbad, California on _____ September 9ᵗʰ, 2024

7

8

Carlos Encinas

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I, Jennifer Encinas, have reviewed the foregoing Verified Complaint and verify under penalty of perjury that it is true and correct.

Executed in Carlsbad, California on _September 9th, 2024_

_____
Jennifer Encinas

## **VERIFICATION**

I, Rebecca Doe, have reviewed the foregoing Verified Complaint and verify under penalty of perjury that it is true and correct.

Executed in Carlsbad, California on ___9/10/24___.

*Rebecca Doe*

Rebecca Doe

1

## <u>VERIFICATION</u>

2

3   I, Tom Doe, have reviewed the foregoing Verified Complaint and verify under

4   penalty of perjury that it is true and correct.

5

6   Executed in Carlsbad, California on 9-10-24 .

7

8   *Tom Doe*
    Tom Doe

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28