David J. Hacker, SBN 249272
dhacker@firstliberty.org
Nathan W. Kellum, *pro hac vice*
TN 13482; MS 8813
nkellum@firstliberty.org
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy, Suite 1600
Plano, TX 75075

Kayla A. Toney, *pro hac vice*
VA 93815; DC 1644219
ktoney@firstliberty.org
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW, Suite 1410
Washington, DC 20004
(202) 918-1554

Dean R. Broyles, SBN 179535
The National Center for Law & Policy
539 West Grand Avenue
Escondido, California 92025
(760) 747-4529
dbroyles@nclplaw.org

Robert J. Reynolds, SBN 151243
Law Office of Robert J. Reynolds
16950 Via de Santa Fe, Suite 5060-145
Rancho Santa Fe, CA 92091
619-261-3393
rjrsdesk@yahoo.com

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.E., a minor by and through his parents, CARLOS AND JENNIFER ENCINAS, et al., <br> *Plaintiffs*, <br><br> v. <br><br> ANDRÉE GREY, in her official capacity as Superintendent of the Encinitas Union School District, and in her individual capacity, et al., <br> *Defendants*. | Case No. 3:24-cv-01611-L-SBC <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DOES' MOTION FOR PSEUDONYMS AND PROTECTIVE ORDER, AND DOES' MOTION FOR PRELIMINARY INJUNCTION** <br> Judge: Hon. M. James Lorenz <br> Courtroom: 5B <br> Hearing Date: Nov. 25, 2024 <br> Hearing Time: 10:30 a.m. PT <br> Pursuant to local rules, there will be no oral argument unless requested by the Court. |

i

MEMORANDUM IN SUPPORT OF DOES' MOTION FOR PSEUDONYMS AND PROTECTIVE ORDER, AND
DOES' MOTION FOR PRELIMINARY INJUNCTION; CASE NO. 3:24-CV-01611-L-SBC

# TABLE OF CONTENTS

STATEMENT OF FACTS ..................................................................................... 1

ARGUMENT .................................................................................................... 6

    I.     The Does Need the Protection of Pseudonyms and a Protective Order. ...................................................................................... 6

    II.    The Does are Likely to Succeed on the Merits of their Claims. ........ 8

        A.  The District wrongfully compels student speech in contravention of the free speech clause. ............................................................... 9

        B.  The District wrongfully denies opt-outs from and notice of religiously objectionable gender identity instruction in contravention of the free exercise clause. .................................... 13

           1. The District's discretion to allow opt-outs triggers strict scrutiny under *Fulton v. City of Philadelphia*……….…………………14

           2. The District's provision of opt-outs for secular reasons triggers strict scrutiny under *Tandon v. Newsom*………………………16

           3. The District's refusal to recognize parents' rights to direct their own children's religious upbringing triggers strict scrutiny under *Wisconsin v. Yoder*……………………………………18

           4. The District's violation of multiple, intertwining, constitutional rights triggers strict scrutiny under *Employment Division v. Smith*……………………………………………………………20

           5. The District's policy cannot survive strict scrutiny…………..21

        C.  The District wrongly refuses opt-outs from religiously objectionable curriculum in contravention of the due process clause……………………………………………………………...22

    III.    The Does Satisfy the Remaining Preliminary Injunction Factors….24

CONCLUSION.................................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*303 Creative v. Elenis,*
    600 U.S. 570 (2023) ................................................................ 10, 12

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
    570 U.S. 205 (2013) ...................................................................... 10

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011).......................................................... 8, 9

*Am. Family Ass'n v. City and Cty. of San Francisco,*
    277 F.3d 1114 (9th Cir. 2002)............................................................ 20

*Arnold v. Bd. of Educ. of Escambia Cnty., Ala.,*
    880 F.2d 305 (11th Cir. 1989)............................................................ 23

*Baird v. Bonta,*
    81 F.4th 1036 (9th Cir. 2023)........................................................ 8, 9

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
    457 U.S. 853 (1982) ...................................................................... 19

*Belanger v. Madera Unified Sch. Dist.,*
    963 F.2d 248 (9th Cir. 1992)............................................................ 17

*Boy Scouts of America v. Dale,*
    530 U. S. 640 (2000) ............................................................... 10, 11

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018)............................................................ 25

*Christian Legal Soc'y v. Walker,*
    453 F.3d 853 (7th Cir. 2006)............................................................ 25

iii

Memorandum in Support of Does' Motion for Pseudonyms and Protective Order, and
Does' Motion for Preliminary Injunction; Case No. 3:24-CV-01611-L-SBC

1

## TABLE OF AUTHORITIES - CONTINUED

2

**CASES (CONT.)**

3

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
4      508 U.S. 520 (1993) .................................................................. 13, 14

5

*David v. Kaulukukui*,
6      38 F.4th 792 (9th Cir. 2022)........................................................... 23

7

*Department of State v. Muñoz*,
8      144 S. Ct. 1812 (2024) ............................................................... 22, 23

9

*Doe v. Kamehameha Sch./Bernice Pauahi Bishop Est.,*
10      596 F.3d 1036 (9th Cir. 2010)……………………………………..6, 7

11

*Doe v. Madison School Dis. No. 321*,
12      147 F.3d 832, (9th Cir. 1998)…………………………………...7

13

*Doe 1 v. GitHub, Inc.*,
14      672 F. Supp. 3d 837 (N.D. Cal. 2023)…………………………….7

15

*Does I thru XXIII v. Advanced Textile Corp.*,
16      214 F.3d 1058 (9th Cir. 2000)……………………………………..6, 7

17

*Elrod v. Burns*,
18      427 U.S. 347 (1976) ..................................................................... 24

19

*Employment Division v. Smith*,
20      494 U.S. 872 (1990) ................................................................. 14, 20

21

*Espinoza v. Montana Dep't of Revenue*,
22      591 U.S. 464 (2020) ..................................................................... 19

23

*Every Nation Campus Ministries at San Diego State Univ. v. Achtenberg*,
24      597 F. Supp. 2d 1075 (S.D. Cal. 2009) ............................................. 20

25

26

28

## TABLE OF AUTHORITIES - CONTINUED

**CASES (CONT.)**

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*
(*FCA*),
82 F.4th 664 (9th Cir. 2023) .........................................................................passim

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) ................................................................................. 14, 21

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
546 U.S. 418 (2006) ............................................................................................ 21

*Green v. Miss United States of Am., LLC*,
52 F.4th 773 (9th Cir. 2022) ................................................................ 11, 12, 21

*Gruenke v. Seip*,
225 F.3d 290 (3d Cir. 2000) ............................................................................ 23

*Hardwick v. Board of School Trustees of Fruitridge School*,
54 Cal.App. 696 (Cal. Ct. App. 1921) ....................................................... 22, 23

*Holt v. Hobbs*,
574 U.S. 352 (2015) ......................................................................................... 21, 22

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,
515 U.S. 557 (1995) ................................................................................. 9, 11, 12

*Janus v. American Federation of State, County, and Municipal Employees,*
*Council 31*,
585 U.S. 878 (2018) ................................................................................... 10, 12

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ............................................................................. 14, 16, 20

## TABLE OF AUTHORITIES - CONTINUED

**CASES (CONT.)**

*Klein v. City of San Clemente*,
   584 F.3d 1196 (9th Cir. 2009)..................................................................25

*Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*,
   584 U.S. 617 (2018) ...............................................................................14

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ..................................................................12

*Meyer v. Nebraska*,
   262 U.S. 390 (1923) ...............................................................................23

*Mirabelli v. Olson*,
   691 F.Supp.3d 1197 (S.D. Cal. 2023) ..............................7, 15, 21, 23

*Morse v. Frederick*,
   551 U.S. 393 (2007) ...............................................................................23

*National Institute of Family and Life Advocates (NIFLA) v. Becerra*,
   585 U.S. 755 (2018) ...............................................................................10

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   591 U.S. 732 (2020) ...............................................................................19

*Parham v. J.R.*,
   442 U.S. 584 1979) ................................................................................23

*Pierce v. Society of Sisters*,
   268 U.S. 510 (1925) ..........................................................................1, 23

*Prince v. Massachusetts*,
   321 U.S. 158 (1944) ...............................................................................23

MEMORANDUM IN SUPPORT OF DOES' MOTION FOR PSEUDONYMS AND PROTECTIVE ORDER, AND
DOES' MOTION FOR PRELIMINARY INJUNCTION; CASE NO. 3:24-CV-01611-L-SBC

## TABLE OF AUTHORITIES - CONTINUED

**CASES (CONT.)**

*Roe v. City & Cnty. of San Francisco*,
  No. 24-CV-01562-JST, 2024 WL 2055150 (N.D. Cal. Apr. 15, 2024)………...7

*Riley's Am. Heritage Farms v. Elsasser*,
  32 F.4th 707 (9th Cir. 2022)................................................................ 12

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013)............................................................. 25

*San Jose Christian College v. City of Morgan Hill*,
  360 F.3d 1024 (9th Cir. 2004)............................................................. 20

*Stanley v. Illinois*,
  405 U.S. 645 (1972) ........................................................................... 21

*Tandon v. Newsom*,
  593 U.S. 61 (2021) .....................................................................passim

*Tatel v. Mt. Lebanon School District*,
  637 F.Supp.3d 295 (W.D. Pa. 2022) ................................................... 19

*Tinker v. Des Moines Independent Community School District*,
  393 U.S. 503 (1969) ........................................................................... 11

*Ward v. Polite*,
  667 F.3d 727 (6th Cir. 2012)............................................................... 12

*Washington v. Glucksberg*,
  521 U. S. 702 (1997) ..................................................................... 22, 23

*West Virginia Board of Education v. Barnette*,
  319 U.S. 624 (1943) ................................................................ 11, 12, 13

MEMORANDUM IN SUPPORT OF DOES' MOTION FOR PSEUDONYMS AND PROTECTIVE ORDER, AND
DOES' MOTION FOR PRELIMINARY INJUNCTION; CASE NO. 3:24-CV-01611-L-SBC

# TABLE OF AUTHORITIES - CONTINUED

**CASES (CONT.)**

*Winkelman v. Parma City Sch. Dist.,*
  550 U.S. 516 (2007) .......................................................................... 23

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .......................................................................... 8, 9

*Wisconsin v. Yoder,*
  406 U.S. 205 (1972) .............................................................. 18, 19, 20

*Zepeda v. U.S. I.N.S.,*
  753 F.2d 719 (9th Cir. 1983) .......................................................... 25

**STATUTES**

U.S. Const. amend. I ................................................................ 13

**OTHER AUTHORITIES**

California Education Code ("EDC") § 51240 ............................ 2, 5, 22

Eugene Volokh, *The Law of Pseudonymous Litigation,*
  73 HASTINGS L.J. 1353 (2022)……………………………………….7

Nearly 100 years ago, the Supreme Court confirmed the government may not "interfere[] with the liberty of parents and guardians to direct the upbringing and education of children." *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534 (1925). Thus, when the Encinitas Union School District ("District") secretly exposed an elementary school child to gender identity instruction that conflicts with his religious beliefs, forced this child to teach a kindergartener, and refused to grant the parents an opt-out from similar gender identity curriculum, it violated their rights to freedom of speech, free exercise of religion, and due process.

P.D. is a sixth grader at La Costa Heights Elementary School ("La Costa Heights"), where last year the District violated his and his parents' constitutional rights by requiring him to affirm and promote gender identity through a children's book titled *My Shadow is Pink* during the school's "buddy" program where older students do activities with younger students. Fearing a similar violation this school year, P.D. and his parents seek to proceed using psuedonyms and under a protective order as well as a preliminary injunction prohibiting the District from requiring P.D. and other elementary school students to read, listen, discuss, write about, affirm, and/or participate in activities or books promoting gender identity without advance notice and opportunity to opt out of the program or curriculum.

## STATEMENT OF FACTS

P.D. is a devout Catholic Christian who has attended La Costa Heights and participated in the District's "buddy" program at the elementary school since kindergarten. Ver. Compl. ¶¶ 47, 51. His parents, Tom and Rebecca Doe, are also devout Catholic Christians and seek to raise their children in accordance with their faith. Mot. for Prelim. Inj. (MPI), Doe Decl. ¶5. In their faith, the Does believe all humans are created in God's image as either male and female, and that it would be

1

morally wrong to urge others to abandon their God-given gender for a different gender. MPI, Doe Decl. ¶¶9-12; Ex. A. They thought they could avoid any objectionable instruction on gender identity under California Education Code ("EDC") § 51240, which allows parents to opt out of health instruction, including gender identity instruction, that conflicts with their religious beliefs. Ver. Compl. ¶¶86, 102. In spring 2024, the Does received advance notice of gender identity instruction in a health unit and they exercised their right to opt P.D. out of it. Ver. Compl. ¶90; Ex. B; Ex. C. However, around the same time, the District inserted the same gender identity teaching in the "buddy" program in which P.D. was forced to participate. Ver. Compl. ¶¶102-04; Ex. D.

Defendants Mr. Murphy and Ms. West, per District policy, and in keeping with District training, chose the book *My Shadow is Pink* for the "buddy" program, a mandatory instructional time, and they used fifth-grade students, including P.D., to inculcate their kindergarten "buddies" with gender identity instruction. Ver. Compl. ¶¶112-14; Ex. E ("We might just inspire some sweet things to fly toward their shadow tomorrow"). In this book, a young boy believes he has gender different from his father, remarking that he "loves wearing dresses and dancing around," and "loves. . . pink toys, princesses, fairies, and things not for boys." Ex. F. The boy analogizes different genders as being different shadows, either pink or blue. Ex. F. A conflict ensues between the boy and his father, who "walks in with a glare" and refers to his son's confusion about gender as "just a phase." Ex. F. The story resolves when the father jettisons his previously-held beliefs. Ex. F. After the boy has a difficult day at school, his father puts on a dress, and encourages his son to embrace the opposite gender, telling the boy to "pick up that dress! Your shadow is pink. I see now it's true. It's not just a shadow, it's your inner-most you." Ex. F.

The story concludes with the father exhorting his son, "So put on that dress and get back to school; if someone won't like you then they are the fool." Ex. F.

Mr. Murphy read this book aloud to P.D and S.E.'s class. MPI, Encinas Decl. ¶31. Next, Mr. Murphy and Ms. West showed the fifth graders a read-along video of the book while sitting next to their kindergarten buddies. Ver. Compl. ¶125. Then, without advance notice or ability to opt out, the teachers forced P.D., S.E., and other fifth graders to affirm the book's message, by having them ask their kindergarten buddy to pick a color that represents their shadow, or gender identity. Then P.D. and S.E. were forced to trace their buddy's shadow outside on the ground using the color that "represent[ed]" the buddy's gender identity. Ver. Compl. ¶¶129-31. P.D and S.E. had no choice but to participate fully, fearful of getting in trouble. Ver. Compl. ¶133; MPI, Encinas Decl. ¶35.

Distraught over what happened, P.D. and S.E. told their parents about the "buddy" program activity that day, and how confusing it was that a teacher they respected had forced them to be a mouthpiece for the District against their own consciences. MPI, Doe Decl. ¶¶46-52; Encinas Decl. ¶¶35-38, 44. Mr. Murphy defended his choice of the book and its use in the program. Ex. H; MPI, Encinas Decl. ¶¶48, 52. The Does and Encinases, along with at least 23 other parents, also notified Superintendent Grey and Principal Kay about their issues with the book activity, but these pleas also fell on deaf ears. Ex. I; Ex. J. Principal Kay assured that gender identity instruction could and would be taught again, and that the school would not provide opt-outs from this curriculum. MPI, Encinas Decl. ¶63.

The Encinases suffered harassment in response to their concerns, and school officials ignored their requests to protect their children. Instead, Principal Kay told the parents of S.E. and P.D.'s closest friends that the Encinases were the ones who

objected. Mot. for Pseudo. and Prot. Order (MPP), Ex. 1; MPP, Encinas Decl. Hostile community members, including Ms. West's husband and Mr. Morton's daughter, threatened their family and told them to move away. MPP, Ex. 2, 6. PTA president Jenny Adams urged students and teachers to participate in a "Pink Out the Hate" event on May 10. Ex. 5. School officials ignored the Encinases' requests to protect S.E. and their younger son C.E. MPP, Ex. 3 (the Encinases' beliefs were publicly called "hatred," their sons begged their parents to withdraw them), Ex. 4 ("Now [S.E.]'s not safe at school!), Ex. 7. District officials and teachers did nothing to stop the "Pink out the Hate" event; instead, they participated and treated it as a laughing matter. Ex. 8.

P.D. was directly affected by these events and has suffered mental anguish, including fear, anxiety, and loss of sleep. Ver. Compl. ¶214; MPP, Doe Decl. ¶7. Given how teachers have ardently defended *My Shadow is Pink* and criticized those who raised concerns, it is unlikely that teachers will help protect P.D., and more likely that he will experience hostility directly from staff members if his identity becomes known. MPP, Doe Decl. ¶9. Tom and Rebecca Doe have also been weighed down by safety concerns for their children's physical, emotional, and spiritual wellbeing. Ver. Compl. ¶215.

Far from an isolated occurrence, Mr. Murphy and Ms. West followed mandatory District directives promoting gender transition to elementary students. First, Regulation 6142.8 cites the Human Rights Campaign's *California LGBTQ Youth Report*, listing "providing diverse books and images" as a "best practice[]" for elementary students. Ex. K. Since 2022, the District has given about $5,000 to each school to buy "equity" books, per Assistant Superintendent Illingworth's approval. Ex. L, M. The District's mandatory all-staff trainings on gender identity, Ex. N, are

4

MEMORANDUM IN SUPPORT OF DOES' MOTION FOR PSEUDONYMS AND PROTECTIVE ORDER, AND DOES' MOTION FOR PRELIMINARY INJUNCTION; CASE NO. 3:24-CV-01611-L-SBC

edited by Trans Family Support Services, which funds minors' gender-transition surgeries. Ex. O. The District's training materials maintain that elementary students are not "too young" to be taught LGBTQ concepts, because "[a]t a very young age children have already been introduced to information about LGBTQIA+ people which is often based on misinformation and negative stereotypes." Ex. P. Both Ms. West and Mr. Murphy receive consistent emails promoting "banned books," Ex. Q, and are encouraged to attend trainings on "LGBTQ+ Affirming and Inclusive Schools." Ex. R.

After the *My Shadow is Pink* activity, several parents started a petition calling for "Parental Opt-in for Controversial Curriculum," which to date has 546 signatures, including the Does, Ex. S, but the District did not respond. At a packed school board meeting on May 21, 2024, the Does and Encinases shared their concerns, requesting opt-outs from exposure and required affirmance of gender identity instruction. Ver. Compl. ¶¶162-66. These efforts generated only a template denial from the District to a few parents. Ex. T.

The Does and the Encinases formally requested an opt-out from religiously objectionable instruction. Ex. U; Ex. V. District officials denied the Encinases' written opt-out request, claiming "the law does not broadly grant parents the right to opt out of *any* instruction that includes reference to gender-identity." Ex. W. District officials similarly denied the Does' to opt out of gender identity instruction for the 2024-25 school year, claiming that "students must participate in the District's curriculum." Ex. X. In both letters, the District's rationale misconstrued EDC § 51240, which requires schools to excuse students from "any part of health instruction that conflicts with the student's religious training and beliefs," as if it applies only in the narrow context of a single health unit. Ex. Y.

While the District refuses to offer notice and opt-outs from gender identity instruction to parents with religious objections, they freely allow notice and opt-outs for instructional activities—including the same gender identity topic when presented in a health unit. Ex. Z. The District permits opt-outs from various other educational activities: "Teambuilding, Regulation, Awareness, and Community" (TRAC) social-emotional learning, Ex. AA, Farm Lab, Ex. BB, spelling lists, Ex. CC, animal dissections for students with moral objections, standardized testing, student surveys, and health checks. Ex. DD; Ex. EE. The District requires parental opt-in through permission slips for field trips and after-school activities. Ex. FF. The District further accommodates students with disabilities, English language learners, Ex. DD, and students who identify as "gender diverse." Ex. GG. Yet the District will not allow the Does to opt P.D. out of programming that forces him to affirm gender identity instruction in direct conflict with their Christian faith. Ex. X. P.D. and his parents need injunctive relief.

## ARGUMENT

### I.  The Does Need the Protection of Pseudonyms and a Protective Order.

When determining whether a party can proceed anonymously, the Ninth Circuit considers (1) "the severity of the threatened harm," (2) "the reasonableness of the anonymous party's fears," (3) "the anonymous party's vulnerability to such retaliation," (4) "whether proceedings can be structured so as to mitigate" any prejudice caused to the opposing party, and (5) "whether the public's interest in the case would be best served by requiring that the litigants reveal their identities." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000). The first two factors are "intricately related and should be addressed together." *Doe v. Kamehameha Sch./Bernice Pauahi Bishop Est.,* 596 F.3d 1036, 1043 (9th Cir.

6

2010). "[P]laintiffs are not required to prove that the defendants intend to carry out the threatened retaliation." *Id.* at 1044. In *Mirabelli v. Olson*, this Court recently granted plaintiffs' motion for partial pseudonymity, finding that "concrete threats of violence are not required to justify pseudonymity." Order Granting-In-Part and Denying-In-Part Plaintiffs' Motion to Amend, ECF No. 130, No. 3:23-cv-00768-BEN-VET (S.D. Cal. Aug. 8, 2024); *see also Doe v. Madison School Dis. No. 321*, 147 F.3d 832, 833 n.1 (9th Cir. 1998), *vacated on other grounds*, 177 F.3d 789 (9th Cir. 1999) (en banc) (allowing pseudonyms due to fear of "retaliation by the community"). Additionally, protecting parents' names is crucial to protecting their children's identities. *See, e.g.,* Eugene Volokh, *The Law of Pseudonymous Litigation*, 73 Hastings L.J. 1353, 1427-29 (2022) (cataloguing 32 cases in federal court where parents proceeded using pseudonyms to protect their children).

Defendants are not prejudiced where plaintiffs, as here, agree to disclose their identities subject to a protective order. "In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to . . . issue protective orders limiting disclosure of the party's name, *see* Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case." *Does I thru XXIII*, 214 F.3d at 1069; *see also Roe v. City & Cnty. of San Francisco*, No. 24-CV-01562-JST, 2024 WL 2055150, at *1 (N.D. Cal. Apr. 15, 2024) (allowing plaintiffs to proceed pseudonymously with protective order); *see Doe 1 v. GitHub, Inc.*, 672 F. Supp. 3d 837, 853-54 (N.D. Cal. 2023) ("Plaintiffs have disclosed their true names to Defendants subject to a protective order, so pseudonymity should not impede Defendants' ability to develop their case.").

Here, the Does reasonably fear that public disclosure of their identity will lead to severe harm, harassment, and retaliation based upon the Encinases' experience. The Doe children, still students at La Costa Heights, face considerable risk of retaliation from teachers, administrators, and peers who can make their lives miserable apart from their parents' protection. The Encinases have suffered many negative effects because of hostility from school officials and community members, ultimately withdrawing their children due to safety concerns. Tom and Rebecca Doe will likely experience this same retaliation if not granted pseudonymity and a protective order, yet they have no other choice but La Costa Heights at this time. MPP, Doe Decl. ¶12. Requiring them to proceed without pseudonyms would be against the public interest because it would discourage future parents who seek to protect their constitutional rights from coming forward at the risk of retaliation. There is no prejudice to Defendants because the Does are willing to offer necessary information to allow Defendants to pursue their defense, including the disclosure of their identities to opposing counsel and the individual Defendants. Thus, the Court should grant the Does' Motion and put the Proposed Protective Order in place.

## II.     The Does are Likely to Succeed on the Merits of their Claims.

A plaintiff seeking a preliminary injunction must ordinarily show (1) "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). This analysis contemplates a "sliding scale approach," "so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). The most important factor is likelihood of success on the merits. *Baird v. Bonta*, 81 F.4th

1036, 1040 (9th Cir. 2023). And "[w]hen the balance of equities 'tips sharply in the plaintiff's favor,' the plaintiff must raise only 'serious questions' on the merits—a lesser showing than likelihood of success." *Fellowship of Christian Athletes (FCA) v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (en banc) (quoting *All. for the Wild Rockies*, 632 F.3d at 1131). When the nonmovant is a government entity, as here, the last two *Winter* factors "merge," with the Court considering harm to the plaintiff and the public in the same light. *Baird*, 81 F.4th at 1040.

The Does meet all factors. The District's policy of forcing elementary school students to receive and teach gender-transition ideology to younger students, without parental opt-out or notice, violates several distinct provisions of the U.S. Constitution, causing significant harm, and must be enjoined. The Does are likely to succeed on each of their constitutional claims concerning ongoing infringements on their rights to free speech, free exercise of religion, and due process.

### A. The District wrongfully compels student speech in contravention of the free speech clause.

The District infuses "equity" books like *My Shadow is Pink* into the school curriculum, including the ongoing "buddy" program, which requires older students like P.D. to affirm and convey messages to younger students that belie their religious beliefs and convictions.

The Supreme Court has consistently held that government compulsion of speech, including symbolic speech, violates the First Amendment, full stop. In *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, Inc., 515 U.S. 557 (1995), the Court held Massachusetts could not force private parade organizers to include a group that would alter the import of its message. The

9

MEMORANDUM IN SUPPORT OF DOES' MOTION FOR PSEUDONYMS AND PROTECTIVE ORDER, AND DOES' MOTION FOR PRELIMINARY INJUNCTION; CASE NO. 3:24-CV-01611-L-SBC

compelled speech doctrine applied to parades because "the Constitution looks beyond written or spoken words as mediums of expression" to a wide variety of creative actions including "armband[s]," "flag[s]," "painting," "music," and "verse." *Id.* at 569. Regarding the excluded group, the Court held that the free speech clause protects "choices of content that in someone's eyes are misguided, or even hurtful." *Id.* at 574. The Court reaffirmed this doctrine in *Boy Scouts of America v. Dale*, observing the Founders "believed that freedom think as you will and to speak as you think are . . . indispensable'" and thus protected by the First Amendment. 530 U. S. 640, 660-61 (2000). Because the Boy Scouts is an "expressive association" protected by the First Amendment, forcing them to include a gay scout leader was held to "interfere with [its] choice not to propound a point of view contrary to its beliefs." *Id.* at 654.

Hence, government officials cannot "compel[] individuals to mouth support for views that they find objectionable," whether by word or deed. *Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 585 U.S. 878, 892 (2018) (non-union members should not be forced to subsidize private speech with which they disagree). The principle holds in virtually any context. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 220-21 (2013) (federally funded program could not condition public benefits on affirming specific beliefs); *National Institute of Family and Life Advocates (NIFLA) v. Becerra*, 585 U.S. 755, 766 (2018) (pro-abortion notice requirement imposed on pregnancy resource clinics was unconstitutional restriction on speech).

Drawing on these precedents, the Supreme Court recently held in *303 Creative v. Elenis* that "the government may not compel a person to speak its own preferred messages," holding a Christian wedding website designer could not be forced to

10

create websites that violated her religious beliefs about marriage. 600 U.S. 570, 586 (2023). The Court explained that it does not "matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include . . . . All that offends the First Amendment just the same." *Id.* at 586-87. Here, the District crossed this constitutional line by compelling older students to teach younger students the District's views on gender.

The school environment cannot excuse this compulsion. Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1969). Indeed, the District's compulsion is akin to that condemned in *West Virginia Board of Education v. Barnette*, 319 U.S. 624 (1943). There, the Supreme Court found fault with a school making elementary school children salute the American flag and recite the Pledge of Allegiance against their religious beliefs, for violating the free speech clause. *Id.* at 632, 637. Saluting the flag was compelled speech because "[s]ymbolism," including "a color or design," "is a primitive but effective way of communicating ideas. . . a short cut from mind to mind." *Id.* at 632. The same reasoning applies here: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.* at 642.

The Ninth Circuit has faithfully followed these precedents to strike down compelled speech as unconstitutional, even when prompted by anti-discrimination laws or policies centering on gender or sexuality. Following *Hurley* and *Dale*, the Ninth Circuit, in *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 780, 784,

792 (9th Cir. 2022), held a beauty pageant for biological females could not be forced to include a transgender participant because that would alter its message, considering "various forms of entertainment and visual expression as purely expressive activities." And in *FCA*, 82 F.4th at 695, the Ninth Circuit observed that "[a]nti-discrimination laws and policies serve undeniably admirable goals, but when those goals collide with the protections of the Constitution, they must yield— no matter how well-intentioned." *See also Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 723 (9th Cir. 2022) (speech about gender identity was matter of public concern); *Meriwether v. Hartop*, 992 F.3d 492, 503 (6th Cir. 2021) (university violated professor's freedom of speech by compelling him to address students with biology-conflicting pronouns); *Ward v. Polite*, 667 F.3d 727, 735-36 (6th Cir. 2012) (university could not compel counseling student to affirm same-sex relationships in violation of her faith).

Here, District officials violated P.D. and S.E.'s free speech rights they compelled them to teach the kindergarten "buddy" about gender identity through reading, watching, conversing, and chalking based on *My Shadow is Pink*. Defendants violated the bedrock principle that government officials cannot force children to speak or act against their religious beliefs and consciences. *303 Creative*, 600 U.S. at 586; *Janus*, 585 U.S. at 892; *Barnette*, 319 U.S. at 634. Because speech encompasses "medium[s] of visual expression," *Green*, 52 F.4th at 780, like artwork and "painting," *Hurley*, 515 U.S. at 569, coercing P.D. to watch the video, elicit from the kindergartener a chalk color representing his gender, then physically chalk the buddy's shadow/gender were expressive acts conveying a gesture of acceptance designed to transmit to the kindergartener that gender identity can change.

The District violated P.D.'s right to free speech via forced participation in the *My Shadow is Pink* exercise for the "buddy" program. Absent injunctive relief, another constitutional violation is inevitable. P.D. must participate in the "buddy" program every week for the entirety of the 2024-25 school year at La Costa Heights where school officials have promised students will receive gender identity instruction without advance notice or opt-outs. Ex. D; Ex. X. If relief is granted, the District will still be able to promote its views—it just cannot force P.D. to promote them too. As in *Barnette*, where most children saluted the flag, most children will still participate in the District's gender identity lessons. But some may not, and that freedom to differ is precisely what the Constitution protects.

**B. The District wrongfully denies opt-outs from and notice of religiously objectionable gender identity instruction in contravention of the free exercise clause.**

The free exercise clause provides that government entities shall make no law "prohibiting the free exercise" of religion, U.S. Const. amend. I, meaning the government may not constitutionally "treat *any* comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 593 U.S. 61, 62 (2021), forbidding both "subtle departures from neutrality" and "covert suppression of particular religious beliefs." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) (citations omitted). Government policies and practices that fall short of these standards are subject to strict scrutiny. *See id.* at 531–32.

The District's policy of denying parents' opt-out requests based on their religious beliefs triggers strict scrutiny under the free exercise clause. For a variety of reasons, the policy is neither neutral nor generally applicable. It is also subject

to a hybrid claim.[1]

### 1. The District's discretion to allow opt-outs triggers strict scrutiny under *Fulton v. City of Philadelphia*.

A government policy or practice is not "generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a 'mechanism for individualized exemptions.'" *Fulton*, 593 U.S. at 533 (citation omitted) (holding Philadelphia violated the free exercise clause when it refused to place foster children with Catholic Social Services because of their religious beliefs). In *FCA*, the Ninth Circuit, sitting *en banc*, reiterated "bedrock requirements of the Free Exercise Clause that the government may not transgress," explaining that "[p]roperly interpreted, *Fulton* counsels that the mere *existence* of a discretionary mechanism to grant exemptions can be sufficient to render a policy

---

[1] The free exercise framework in *Employment Division v. Smith* would require the Does to show the District's policies are not neutral or generally applicable or to bring a hybrid claim for strict scrutiny to apply. *See* 494 U.S. 872, 879-81 (1990). The *Smith* decision, though, has lately come under severe criticism from the Supreme Court. *See Lukumi*, 508 U.S. at 559-564 (Souter, J., concurring); *Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 643 (Gorsuch, J., concurring) (2018); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022). *Smith* has proven unworkable in practice and inconsistent with the original public meaning of the free exercise clause. *See, e.g.*, *Fulton v. City of Philadelphia*, 593 U.S. 522, 614 (2021) (Alito, J., concurring) ("*Smith* was wrongly decided. As long as it remains on the books, it threatens a fundamental freedom."); *id.* at 618, 626 (Gorsuch, J., concurring) ("*Smith* failed to respect this Court's precedents, was mistaken as a matter of the Constitution's original public meaning, and has proven unworkable in practice. . . . No fewer than ten Justices—including six sitting Justices—have questioned its fidelity to the Constitution."). Thus, the Does preserve for later review the argument that *Smith* and its framework should be overruled.

1  not generally applicable, regardless of the actual exercise." 82 F.4th 664, 686-88
2  (emphasis added). In the public school context, the appellate court applied strict
3  scrutiny because administrators had discretion among other things to approve or
4  deny clubs. *Id*. at 688. Similarly, in *Mirabelli v. Olson*, 691 F. Supp. 3d 1197 (S.D.
5  Cal. 2023), this Court held that the district triggered strict scrutiny and likely
6  violated the free exercise clause when it forced religious teachers to hide students'
7  gender transitions from their own parents. The Court reasoned that there were "no
8  standards written in the policy for determining what is a 'legitimate need[,]'" for
9  parents to know about a student's transition, "only that it requires a case-by-case
10 decision. . . . This is the very definition of a discretionary exemption." *Id.* at 1217.

11     Here, the District exercises discretion to allow opt-outs for gender identity
12 instruction in a health unit, Ex. B, C, but not in other curriculum, like the "buddy"
13 program. Ex. X. District officials further maintain discretion on whether to allow
14 opt-outs from instructional time in other contexts. Though the "mere existence of a
15 discretionary mechanism" is enough to initiate strict scrutiny, *FCA*, 82 F.4th at 687-
16 88, District officials regularly exercise this discretion, granting or denying requests
17 for opt-outs. For example, the District allows opt-outs from Farm Lab, an
18 experience that "all fourth-graders participate in." Ex. BB. After a parent complaint,
19 a District employee advised that "all our families do have the choice to opt out of
20 this experience." Ex. BB. *See also* MPI, Doe Decl. at ¶¶71-77; Ex. AA (granting
21 discretionary opt-outs for TRAC social-emotional learning); Ex. FF (requiring
22 parent permission slips for after-school activities); Ex. CC (teacher allowing opt-
23 out of spelling list). The use of discretion is inherent in the classroom setting.
24 Parents can also opt out of TRAC activities and after-school activities, but not the
25 "buddy" program, with no explanation other than the District says so. Even if the

26                                         15
27
28

District never granted opt-outs for any other situation, the discretionary system in place triggers strict scrutiny.

### 2. The District's provision of opt-outs for secular reasons triggers strict scrutiny under *Tandon v. Newsom*.

Government policies or practices are not neutral and generally applicable when they "treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62-64 (finding California could not restrict home worship gatherings while permitting comparable secular activities at hair salons, retail stores, movie theaters, and indoor restaurants); *Kennedy*, 597 U.S. at 526 ("A government policy will fail the general applicability requirement if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way[.]") (cleaned up). The existence of a single secular comparator or categorical exemption while denying a religious exemption is sufficient for strict scrutiny.

Applying *Tandon* to the public school setting in *FCA*, the Ninth Circuit explained that when making comparisons, what matters is "the risks various activities pose" and "not the reasons why people gather." 82 F.4th at 689 (citing *Tandon*, 593 U.S. at 62). There, the district's asserted interest was ensuring equal access for all students to all programs and in prohibiting discrimination based on protected classes – yet it allowed exemptions for other student clubs and district programs that selected leaders and members by protected characteristics. To allow these exemptions but deny an exemption to FCA indicated a lack of neutrality and general applicability. So too here. In denying the Does' request for an opt-out due to religious reasons, District officials claimed that "students must participate in the District's curriculum." Ex. X. Yet by routinely permitting opt-outs for other reasons,

the District has treated non-religious concerns more favorably than religious concerns. By admission, the District regularly provides multiple kinds of opt-outs to its families, regardless of the reason. Ex. DD. These opt-outs include but are not limited to: state academic testing, "comprehensive sexual health and HIV prevention education," "sexual abuse, and human trafficking prevention education," "physical education classes," and "tests, questionnaires, and surveys containing questions about certain personal information." Ex. EE. Families can opt out of physical health examinations and English language programs. Ex. DD. And while denying opt-outs for gender identity instruction due to religious objections, the District allows opt-outs from other instruction, such as animal dissections, due to non-religious moral objections. Ex. DD.

Though these opt-outs are required by state law, they are apt comparators under *Tandon* because they undermine the District's purported interest in having all students "participate in the District's curriculum"; the District routinely grants them without any interruption to its educational goals. Nor can the District avoid the comparators by pointing at the state; California school districts are considered "agents of the state." *Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248, 253 (9th Cir. 1992) ("public schooling is considered a central governmental function under California law and . . . school districts are considered agents of the state in carrying out this function").

In any event, the District supplies various opt-outs that state law does not require. For example, TRAC is a social-emotional learning program requiring students with behavioral conflict to participate in restorative circles. Ex. AA. While the District's rationale for TRAC is to reduce bullying and harassment between students, District officials still allow opt-outs from certain activities because not

17

MEMORANDUM IN SUPPORT OF DOES' MOTION FOR PSEUDONYMS AND PROTECTIVE ORDER, AND
DOES' MOTION FOR PRELIMINARY INJUNCTION; CASE NO. 3:24-CV-01611-L-SBC

all families are comfortable with this form of conflict resolution. MPI, Doe Decl. at ¶72. Other educational activities, such as field trips and after-school tutoring, require parental opt-in through permission slips. Ex. FF.

While only one secular comparator is needed to trigger strict scrutiny under *Tandon*, the litany of examples show how flexible the District can be in accommodating individual families – except for the Plaintiffs. As *Tandon* and *FCA* explain, the relevant comparison is between the impact on the District's asserted interests, not the reasons why one parent may request an opt-out or why the school may permit it. Many educational areas the District allows opt-outs from are considered important: academic standardized testing; physical education and health; sexual education; reducing bullying and harassment; and relational growth. Yet in all these contexts, the District recognizes that the classroom setting is not one-size-fits-all, and thus permits advance notice and opt-outs to parents, without undermining its purported goals or disrupting the educational experience. Indeed, allowing occasional opt-outs from one half-hour "buddy" program would cause much less disruption than providing alternate instruction for students sitting out of gym class or dissections, or allowing students to skip an entire unit of health class or testing. Since the District grants these accommodations, its stubborn refusal to do so for Does' religious beliefs triggers strict scrutiny.

### 3. The District's refusal to recognize parents' rights to direct their own children's religious upbringing triggers strict scrutiny under *Wisconsin v. Yoder*.

The free exercise clause further protects parents' freedom to direct their children's education and to impart sincere religious beliefs to them, without government interference. *See Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972)

(parental rights regarding religious upbringing are "specifically protected by the Free Exercise Clause," "[l]ong before . . . universal formal education"). Parents— not public schools—have the authority to inculcate "moral standards, religious beliefs, and elements of good citizenship" to children. 406 U.S. at 233. For nearly 100 years, the Supreme Court has reaffirmed the "enduring American tradition" of "the rights of parents to direct 'the religious upbringing' of their children." *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 486 (2020) (quoting *Yoder*, 406 U.S. at 213-14); *see also Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 754-56 (2020) (describing how many religious traditions entrust parents with teaching faith to their children without government interference).

The Supreme Court has also recognized that "the discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 864 (1982). In a strikingly similar scenario, *Tatel v. Mt. Lebanon School District*, a federal district court upheld parents' right to free exercise of religion based on their "sincerely held religious beliefs about sexual or gender identity and the desire to inculcate those beliefs in their children." 637 F. Supp. 3d 295, 330 (W.D. Pa. 2022). When a first-grade teacher advocated her own beliefs about gender identity, the court determined the parents alleged a valid free exercise claim against the school for failing to provide opt-outs from this objectionable instruction. *Id.*

The Does likewise make out a valid free exercise claim here. The District undoubtedly wishes to be "empowered, as *parens patriae*, to 'save' a child from himself or his [religious] parents" so that "the State will in large measure influence, if not determine, the religious future of the child." *Yoder*, 406 U.S. at 232. But the

Constitution does not grant this power to the school. By denying the Does' opt-out requests from teachings and activities that violate their faith, the District is violating their First Amendment right to direct their children's upbringing.

### 4. The District's violation of multiple, intertwining, constitutional rights triggers strict scrutiny as a hybrid claim under *Employment Division v. Smith.*

In *Smith,* the Supreme Court noted the coupling of free exercise rights with parental rights in *Yoder*, explaining that this "hybrid" can justify strict scrutiny analysis. *Smith*, 494 U.S. at 881-82. Under this doctrine, "free exercise claims implicating other constitutional protections, such as free speech, could qualify for strict scrutiny even if the challenged law is neutral and generally applicable." *Am. Family Ass'n v. City and Cty. of San Francisco*, 277 F.3d 1114, 1124 (9th Cir. 2002). A hybrid claim is found when plaintiff makes a colorable claim that a companion right was violated. *See Every Nation Campus Ministries at San Diego State Univ. v. Achtenberg*, 597 F. Supp. 2d 1075, 1098 (S.D. Cal. 2009). The plaintiff is to show a "fair probability or a likelihood, but not a certitude, of success on the merits" on a companion constitutional claim. *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1032 (9th Cir. 2004).

At a bare minimum, the Does present herein a "fair probability" of success on their free speech claim as well as their parental rights claim, buttressing the free exercise of religion claim and the invocation of strict scrutiny herein.[2]

---

[2] The First Amendment "doubly protects religious speech." *Kennedy*, 597 U.S. at 523 ("Where the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities.") Thus, while each claim stands on its own, the Does also bring a merited hybrid rights case.

**5.  The District's policy cannot survive strict scrutiny.**

The District cannot articulate a compelling interest for denying opt-outs to the Does or Encinases. It cannot "rely on broadly formulated interests" "at a high level of generality" but must specify "the asserted harm of granting specific exemptions to particular religious claimants." *Fulton*, 593 U.S. at 541 (citing *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430-32 (2006)). In *Mirabelli*, 691 F. Supp. 3d at 1217-18, the district argued that its "purpose of protecting gender diverse students from (an undefined) harm is a compelling governmental interest." This Court rejected the argument, noting, "both the Ninth Circuit and the Supreme Court have found overly broad formulations of compelling government interests unavailing." *Id.* (citing *Green*, 52 F.4th at 792) (citation omitted) ("identifying the issue as 'not whether [the government] has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to [plaintiff].'")

The only interest the District identifies for denying opt-outs is an "overall policy against discrimination." Ex. X. It fails to expound on how granting an opt-out would impact LGBTQ students. And any such contention would be undermined by the District's allowance for opt-outs in other types of educational instruction designed to prevent bullying and harassment, like TRAC activities and "sexual abuse" education. Ex. EE. Nor has the District chosen the least restrictive means to pursue its purported goals. Under *Fulton,* "[s]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." 593 U.S. at 541. "'The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting

21

3abf5ebc4f438846

party." *Holt v. Hobbs*, 574 U.S. 352, 364-65 (2015) (cleaned up). Forcing religious students to receive, affirm, and speak messages that violate their consciences cannot be the least restrictive means for any legitimate interest.

The burdens the District's policy and practices impose on the Does' free exercise are far from incidental; rather, the record reveals a concerted campaign to compel the Does and other religious families to embrace gender identity instruction.

### C. The District wrongly refuses opt-outs from religiously objectionable curriculum in contravention of the due process clause.

The due process clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Department of State v. Muñoz*, 144 S. Ct. 1812, 1821 (2024) (quoting *Washington v. Glucksberg*, 521 U. S. 702, 720-21 (1997)).[3] A fundamental right under the due process clause requires: (1) a "careful description of the asserted fundamental liberty interest," and (2) a showing that the asserted right is "'deeply rooted in this Nation's history and tradition.'" *Muñoz*, 144 S. Ct. at 1822 (citation omitted). There is perhaps no right more deeply rooted in our Nation's history and tradition than the right of parents to direct their children's upbringing. In 1921, a California court recognized "the right of parents to control their own children--to require them to live up to the teachings and the principles which are inculcated in them at home under . . . parental

---

[3] In addition to their substantive due process claim, Plaintiff Parents bring a procedural due process claim. Ver. Compl. at ¶¶257-65. The parents are deprived of a liberty interest due to a deceptive opt-out policy that purports to comply with EDC § 51240 by granting opt-outs from gender identity instruction in the context of health class while refusing to grant opt-outs from the same teaching in other curriculum. The policy and process are unduly vague.

authority." *Hardwick v. Board of School Trustees of Fruitridge School*, 54 Cal.App. 696, 709 (Cal. Ct. App. 1921) (finding religious parents had right to opt their children out of dancing at public school). As this Court acknowledged in *Mirabelli*: "A parent's right to make decisions concerning the care, custody, control, and medical care of their children is one of the oldest of the fundamental liberty interests that Americans enjoy." 691 F. Supp. 3d at 1202, 1210-12 (citing *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Stanley v. Illinois*, 405 U.S. 645 (1972); *Parham v. J.R.*, 442 U.S. 584, 604 (1979); *Hodgson v. Minnesota*, 497 U.S. 417, 447 (1990) (plurality); *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 529 (2007); and *David v. Kaulukukui*, 38 F.4th 792, 799 (9th Cir. 2022)). Built on over a century of Supreme Court precedent, the "'liberty' specially protected by the Due Process Clause includes the right[] … to direct the education and upbringing of one's children." *Glucksberg*, 521 U.S. at 720.

This right is especially strong in public school settings where the "situation raises profound moral and religious concerns." *Arnold v. Bd. of Educ. of Escambia Cnty., Ala.*, 880 F.2d 305, 313-14 (11th Cir. 1989); *see also Gruenke v. Seip,* 225 F.3d 290, 307 (3d Cir. 2000) (coach revealed a student's pregnancy against her family's wishes, and court held that "[i]t is not educators, but parents who have primary rights in the upbringing of children"). Parents do not forego their rights when they choose to send their children to public school; "[m]ost parents, realistically, have no choice but to send their children to a public school and little ability to influence what occurs in the school." *Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring).

The Does' interest here is carefully defined: because of their sincere religious beliefs, they should receive notice and an opt-out before their children are exposed to gender identity materials conflicting with their faith. And under no circumstances should the school force their children to speak against their religious beliefs. The District's history of ignoring and disrespecting parents' concerns, Ver. Compl. ¶¶161-78, juxtaposed against this country's long tradition of respecting parental rights, reflects a substantive due process violation. The Does made their religious beliefs and concerns about gender identity clear to the District on multiple occasions, both before and after the *My Shadow is Pink* activity. MPI, Doe Decl. ¶¶23-24. District policy and agendas pose a direct conflict with the Catholic teaching P.D. receives at home from his parents, *id.* ¶¶21, 79, and the refusal to allow an opt-out interferes with the Does' ability to direct their child's upbringing.

**III.   The Does Satisfy the Remaining Preliminary Injunction Factors.**

Irreparable harm is "relatively easy to establish in a First Amendment case" because plaintiffs "need only demonstrate the existence of a colorable First Amendment claim." *FCA*, 82 F.4th at 694-95 (citation omitted). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Here, P.D. is obliged to participate in the "buddy" program every week for the current school year, Ex. D, and the Does have a well-founded fear the District will continue violating their constitutional rights. Principal Kay assured this situation will reoccur, Ver. Compl. ¶157, with no notice or opt-outs from gender identity programming. The Does asked to opt out from gender identity instruction in 2024-25, and the District's emphatic denial makes clear that it will continue. Ex. X.

The balance of equities and the public interest also favor an injunction. In

challenges to government action affecting constitutional rights, "[t]he balance of equities and the public interest . . . tip[s] sharply in favor of enjoining the" law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). Further, "injunctions protecting First Amendment freedoms are always in the public interest," *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006), and "protecting religious liberty and conscience is obviously in the public interest." *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018). A government entity "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983)). Nor can it "suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Thus, protecting the Doe Plaintiffs would only benefit the public interest here.

## CONCLUSION

The Does respectfully request that this Court grant their Motions.

Respectfully submitted this 23rd day of September, 2024.

By: ___/s/__Nathan W. Kellum____
FIRST LIBERTY INSTITUTE
Nathan W. Kellum, *pro hac vice*
nkellum@firstliberty.org
David J. Hacker, SBN 249272
dhacker@firstliberty.org
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy, Suite 1600
Plano, TX 75075

Dean R. Broyles, SBN 179535
The National Center for Law
& Policy
539 West Grand Avenue
Escondido, California 92025
(760) 747-4529
dbroyles@nclplaw.org

Robert J. Reynolds, SBN
151243
Law Office of Robert J.
Reynolds
16950 Via de Santa Fe, Suite
5060-145
Rancho Santa Fe, CA 92091
619-261-3393
rjrsdesk@yahoo.com

Kayla A. Toney, *pro hac vice*
ktoney@firstliberty.org
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW Suite 1410
Washington, DC 20004
(202) 918-1554

*Attorneys for Plaintiffs*

Memorandum in Support of Does' Motion for Pseudonyms and Protective Order, and
Does' Motion for Preliminary Injunction; Case No. 3:24-CV-01611-L-SBC