UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.E. et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ANDREE GREY et al.,<br><br>Defendants. | CASE NO. 3:24-cv-1611-L-SBC<br><br>**ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>[ECF NO. 9] |

Pending before the Court is a motion for preliminary injunction (ECF No. 9) filed by Plaintiffs Tom and Rebecca Doe on their own behalf and on behalf of their minor son P.D.[1]  (ECF No. 9.)  Defendants filed an opposition (ECF No. 25) and the Does replied (ECF No. 26).  The Court decides the matter on the papers submitted without oral argument.  *See* Civ. L.R. 7.1 (d)(1).  For the reasons stated below, the motion is granted in part.

/ / / / /

---

[1]    Included in the same brief is Plaintiffs' motion for a protective order and to proceed under pseudonyms.  These requests are addressed in a separate order.  (*See* ECF No. 35.)

**I.    BACKGROUND**

The Does are parents of Plaintiff P.D., a student at La Costa Heights Elementary School in the Encinitas Union School District.  This action was filed by the Does and P.D. together with Plaintiffs Carlos and Jennifer Encinas and their son S.E.[2] against school district officials and board members, the school principal, and two teachers (collectively "Defendants").  It arises from an educational activity at odds with Plaintiffs' religious beliefs.

The school activity at issue occurred in the context of the buddy program, a weekly class pairing younger and older students.  (*See* ECF No. 9-2, "Encinas Decl." ¶¶ 23, 24; ECF No. 9-3, "Doe Decl." ¶ 38; Pls' Ex. 4;[3] ECF No. 25, "Opp'n" at 2.)  The buddy program is a mandatory part of the school curriculum.  (Opp'n at 5-6; *see also* Doe Decl. ¶ 36; Encinas Decl. ¶ 23.)  P.D. and S.E., both fifth graders, were each paired with a kindergartener.  (*See* Encinas Decl. ¶ 24; Doe Decl. ¶¶ 37-38; Pls' Ex. 4; Opp'n at 2.)  In this program, "students in the older classroom mentor students in the younger classroom."  (Opp'n at 2; *see also* Encinas Decl. ¶ 24; Doe Decl. ¶¶ 37-39, 60.)

Until the buddy class at issue, the buddy program involved art or garden projects, and any books read in the class were selected by the students.  (Encinas Decl. ¶ 33.)  The school sent parents a weekly newsletter listing the books the students were reading each week.  (*See* Doe Decl. ¶ 55; Encinas Decl. ¶ 56.)  For the buddy class at issue, the book entitled *My Shadow Is Pink* was selected by the teachers (*see* Pls' Ex. H; *see also* Encinas Decl. ¶ 52) and was not listed in the weekly newsletter (Doe Decl. ¶ 55; Encinas Decl. ¶ 56).

/ / / / /

---

[2]    Because the Encinases have withdrawn S.E. from the Encinitas Union School District, they have not joined in the pending motion.

[3]    All Plaintiffs' exhibits are filed at ECF No. 9.

1  *My Shadow Is Pink* is about a boy who liked to wear dresses and play with toys

2  associated with girls.  (Pls' Ex. F.)  Because the boy thought he did not "fit in" with his

3  family and peers, his shadow was pink rather than blue.  (*Id.*)  The story involves a

4  conflict between the boy and his father.  The father eventually comes to accept his son's

5  "pink shadow" not as a phase but as reflecting the boy's "inner-most self."  (*Id.*)

6  Although the term "gender identity" does not appear in the book, the author describes it

7  as a children's book on the subject of gender identity.  (Defs' Ex. 5;[4] *see also* Defs' Ex.

8  4; Pls' Ex. F.)  Defendants admit that the book "does address gender identity."  (Opp'n at

9  3.)

10  In preparation for the buddy class, the teacher first read the book to P.D. and S.E.'s

11  fifth grade class.  (Doe Decl. ¶ 41; Encinas Decl. ¶ 31; Pls' Ex. H.)  The fifth graders then

12  joined their kindergarten buddies, and the teacher showed a read-along video of the book

13  to the fifth graders sitting next to their respective buddies.  (*See* Doe Decl. ¶ 45; Encinas

14  Decl. ¶ 34; Pls' Exs. E, H.)  The video was followed by an "art activity" in which the

15  teacher asked the kindergarteners to "pick a color that represents you," and instructed the

16  fifth graders to trace their respective buddies' shadows on the ground with colored chalk.

17  (Opp'n at 2; *see also* Doe Decl. ¶ 47; Encinas Decl. ¶ 37; Pls' Exs. E, H.)  Although the

18  class did not involve an explicit discussion of gender identity (*see* Pls' Ex. H), the fact

19  that the book addressed this issue was not lost on the students.  S.E. described the book as

20  "about LGBTQ."  (Encinas Decl. ¶ 29.)  P.D. described it as "about a boy who wanted to

21  change his gender to be a girl."  (Doe Decl. ¶ 42.)

22  Because choosing one's own gender identity is contrary to Plaintiffs' religious

23  beliefs, they were uncomfortable with the buddy class.  (Doe Decl. ¶¶ 5-20, 40, 42, 46,

24  48, 51, 54; Encinas Decl. ¶¶ 6-13, 30, 35, 38; Pls' Ex. H.)  Moreover, as mentors, P.D.

25  / / / / /

26

27  _____

28  [4]    All Defendants' exhibits are filed at ECF No. 25-1.

1  and S.E. did not wish to affirm the book's message to their buddies.  (Doe Decl. ¶ 46, 48-
2  49; Encinas Decl. ¶¶ 36, 48.)

3      When S.E. and P.D. told their parents about the class, the parents inquired with
4  Defendants why they did not receive notice and an opportunity to opt out, as they did
5  when gender identity was covered in health instruction.  (*See* Doe Decl. ¶¶ 25, 43, 57, 64-
6  65, 67; Encinas Decl. ¶¶48, 46-53, 57-64, 68-72; Pls' Exs. H, I, U, V.)  For example, the
7  material for the fifth grade Human Growth and Development Unit in health education
8  covered gender identity.  (*See* Doe Decl. ¶¶ 26-31; Pls' Ex. C.)  The classroom
9  presentation slides noted that a person's gender identity may change depending on
10  whether "they feel like they are a boy or a girl, or neither or both," and taught the
11  importance of respecting differences among individuals.  (Pls' Ex. C.)  The parents
12  received a two-week notice with a copy of the materials that would be presented to their
13  children, and an opportunity to opt out of health instruction pursuant to California
14  Education Code Section 51240.  (Doe Decl. ¶ 28; Pls' Ex. B.)  Section 51240 provides in
15  pertinent part:

16      If any part of a school's instruction in health conflicts with the religious
17      training and beliefs of a parent or guardian of a pupil, the pupil, upon written
       request of the parent or guardian, shall be excused from the part of the
18      instruction that conflicts with the religious training and beliefs.

19

20  Based on their religious beliefs, Plaintiffs opted out of the Human Growth and
21  Development Unit.  (*See* Doe Decl. ¶ 34; Encinas Decl. ¶ 22.)  However, when parent
22  Plaintiffs asked Defendants why they did not receive advance notice of *My Shadow Is*
23  *Pink* buddy class (*see* Doe Decl. ¶¶ 25- Encinas Decl. ¶¶48, 46-53, 57-64, 68-72; Pls'
24  Exs. H, U), Defendants responded that Plaintiffs had no right to opt out because the
25  buddy class was not part of a "health unit."  (Doe Decl. ¶¶ 67, 68; Encinas Decl. ¶¶ 61,
26  63-64, 73-74; Pls' Exs. W, X.)  Furthermore, the teachers suggested that similar buddy
27  activities would be provided in the future without notice and an opportunity to opt out.
28  (*See* Encinas Decl. ¶¶ 53, 55-57, 63-67.)

24cv1611-L-SBC

Based on the foregoing, Plaintiffs filed this action pursuant to 42 U.S.C. § 1983. They alleged that Defendants violated their First Amendment and Due Process rights under the United States Constitution.[5]  They seek declaratory and injunctive relief prohibiting Defendants from forcing students to participate in gender identity activities and directing Defendants to provide parents with notice and an opportunity to opt out.

## II.    DISCUSSION

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).[6]  When, as here, a party requests preliminary injunctive relief under Federal Rule of Civil Procedure 65, the party must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).  When the nonmovant

/ / / / /

---

[5]    Plaintiffs alleged that (1) Defendants violated the Free Speech Clause of the First Amendment by compelling the student Plaintiffs to affirm a message contrary to their religious beliefs; (2) in refusing to provide an opportunity to opt out on religious grounds, while providing an opportunity to opt out from other curricular activities on various grounds, Defendants violated Plaintiffs' rights under the Free Exercise Clause of the First Amendment; (3) Defendants violated the Free Exercise Clause of the First Amendment by infringing the parent Plaintiffs' right to direct their children's education; (4) Defendants infringed on the parent Plaintiffs' fundamental liberty interest to direct the upbringing of their children and thereby violated the parents' substantive due process rights under the Fourteenth Amendment; and (5) Defendants maintained an arbitrary policy of providing an opportunity to opt out on religious grounds from gender identity content of health education while refusing to provide it for the buddy class thereby violating procedural due process rights under the Fourteenth Amendment.  (*See* ECF No. 1, Verified Complaint.)

[6]    Unless otherwise noted, internal quotation marks, ellipses, brackets, citations, and footnotes are omitted from citations.

24cv1611-L-SBC

1    is a government entity, the last two *Winter* factors merge.  *Baird v. Bonta*, 81 F.4th 1036,

2    1040 (9th Cir. 2023).

3         A sliding scale approach is applied to these elements.  *See Alliance for Wild*

4    *Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  The elements are balanced so

5    that where a plaintiff can make a stronger showing of one element it may offset a weaker

6    showing of another.  *Id*. at 1131, 1134-35.  "Therefore, serious questions going to the

7    merits and a hardship balance that tips sharply towards the plaintiff can support issuance

8    of an injunction, so long as the plaintiff also shows a likelihood of irreparable injury and

9    that the injunction is in the public interest."  *Id*. at 1134-35.

10        **A.    Likelihood of Success on the Merits**

11        The first *Winter* factor, likelihood of success, is a threshold inquiry and is
      the most important factor in any motion for a preliminary injunction.  That
12    holds especially true for cases where a plaintiff seeks a preliminary
      injunction because of an alleged constitutional violation.  If a plaintiff
13    bringing such a claim shows he is likely to prevail on the merits, that
      showing will almost always demonstrate he is suffering irreparable harm as
14    well.

15

16

17    *Baird*, 81 F.4th at 1042.

18        Plaintiffs contend, among other things, that Defendants violated P.D.'s rights under

19    the Free Speech Clause of the First Amendment[7] by compelling him to affirm a message

20    he disagrees with, and which is contrary to his religious beliefs.  Defendants counter that

21    Plaintiffs cannot prevail on the merits of this claim.

22        Initially, Defendants argue that parents have no fundamental right to control the

23    information public schools make available to their children.  (Opp'n at 1, 12 (citing

24    *Fields v. Palmdale Sch. Dist.,* 447 F.3d 1187 (9th Cir. 2006).)  This, however, does not

25

26

27    [7]    The First Amendment applies to the States by incorporation into the Due Process
      Clause of the Fourteenth Amendment.  *Janus v. Am. Fed. of State, County, and*
28    *Municipal Employees,* 585 U.S. 878, 891-92 (2018).

24cv1611-L-SBC

1  negate "the limitations that the First Amendment imposes on the actions of all

2  government agencies, including school boards." *Fields,* 447 F.3d at 1190; *see also W.*

3  *Va. State Bd of Educ. v. Barnette,* 319 U.S. 624, 637 (1943) ("*Barnette*") (Boards of

4  Education perform important and highly discretionary functions, "but none that they may

5  not perform within the limits of the Bill of Rights."). Accordingly, First Amendment

6  protections apply to students in the school environment. *Tinker v. Des Moines Indep.*

7  *Comm. Sch. Dist.,* 393 U.S. 503, 506 (1969).

8       "[T]he First Amendment guarantees 'freedom of speech,' a term necessarily

9  comprising the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed. of*

10 *the Blind of N. C., Inc.,* 487 U.S. 781, 796-97 (1988) (emph. in orig.). The First

11 Amendment protection applies regardless of whether the speech is sensible and well

12 intentioned or offensive and deeply misguided. *303 Creative LLC v. Elenis,* 600 U.S.

13 570, 586 (2023); *see also id.* at 595. The government may not compel a person to speak

14 the government's preferred messages. *Id.* at 586. Compelling individuals to mouth

15 support for views they find objectionable violates the First Amendment. *Janus v. Am.*

16 *Fed. of State, County, and Municipal Employees,* 585 U.S. 878, 892 (2018). Compelled

17 speech is "demeaning" because "individuals are coerced into betraying their convictions

18 [and] endors[ing] ideas they find objectionable[.]" *Id.* at 893.

19       Defendants argue that P.D.'s participation in the buddy class was not compelled

20 because Plaintiffs do not contend that non-participation would result in punishment.

21 Given Defendants' admission that the buddy program is a mandatory part of the

22 curriculum (Opp'n at 5-6), the argument is unpersuasive.

23       Defendants also claim that P.D. was not compelled because he did not complain to

24 his teacher during the class that he was uncomfortable participating. This argument is

25 unavailing. Elementary school students are impressionable due to their "emulation of

26 teachers as role models and … susceptibility to peer pressure." *Edwards v Aguillard,* 482

27 U.S. 578, 584 (1987). P.D. held his teacher in high esteem. (Doe Decl. ¶ 52.) He was

28 shocked and confused when his teacher read *My Shadow Is Pink* to the class. (*Id.* ¶¶ 52,

1    54.)  Although P.D. did not want to participate, he did not complain to his teacher

2    because he did not want to "get in trouble."  (*Id.* ¶¶ 48, 51.)  That P.D. did not

3    immediately complain does not negate compulsion, particularly considering the

4    mandatory nature of the class.

5         In arguing that the First Amendment protects P.D. from being compelled to convey

6    a state-mandated message contrary to his beliefs, Plaintiffs rely on *Barnette*.  There*,* the

7    state board of education adopted a regulation requiring public school students to salute

8    the United States flag and recite the Pledge of Allegiance.  *Barnette,* 319 U.S. at 626.

9    Parents who were Jehovah's Witnesses sought an injunction to restrain enforcement of

10   the regulation against their children as contrary to their religious beliefs.  *Id.* at 629-30.

11   *Barnette* found that participating in the ritual of saluting the flag and reciting the pledge

12   was speech under the First Amendment, *id.* at 631-33, and that compelled participation

13   violated the students' freedom of speech, *id.* at 642.

14        Defendants counter that *Barnette* is inapposite because P.D. was not compelled to

15   profess anything to his kindergarten buddy but was merely a passive listener.  This

16   argument is unavailing.

17        The buddy program differs from regular classroom instruction in that the fifth

18   graders mentor their kindergarten buddies.  In addition, *My Shadow Is Pink* buddy class

19   required fifth graders to trace their buddy's shadow on the ground in the buddy's chosen

20   color.  P.D. was therefore not merely a passive listener.

21        "[T]he First Amendment extends to all persons engaged in expressive conduct."

22   *303 Creative LLC,* 600 U.S. at 600.  "All manner of speech—from pictures, films,

23   paintings, drawings, and engravings, to oral utterance and the printed word—qualify for

24   the First Amendment's protections[.]"  *Id.* at 587.  P.D.'s tracing of his buddy's shadow

25   on the ground was an expressive act protected by the First Amendment.

26        "Equally, the First Amendment protects acts of expressive association."  *303*

27   *Creative LLC,* 600 U.S. at 586.  For example, state law could not compel Boy Scouts to

28   retain a scoutmaster who was a gay rights activist, when this was contrary to the values

24cv1611-L-SBC

1   Boy Scouts sought to instill in their juvenile members and interfered with Boy Scouts'
2   "choice not to propound a point of view contrary to its beliefs." *Boy Scouts of Am. v.*
3   *Dale,* 530 U.S. 640, 644, 650, 659 (2000); *see also Hurley v. Irish-Am. GLIB Grp. of*
4   *Boston,* 515 U.S, 557, 573 (1995) (Forced inclusion of a group promoting homosexuality
5   in a St. Patrick's Day parade violated the parade organizers' freedom of speech). The
6   First Amendment protects the "right to eschew association for expressive purposes."
7   *Janus,* 585 U.S. at 892.

8       In light of P.D.'s role in the class as his buddy's mentor, P.D.'s presence next to
9   his buddy during the read-along video presentation and subsequent tracing of his buddy's
10  shadow in the buddy's chosen color implicitly conveyed P.D.'s endorsement of the
11  message that gender can be a matter of one's choice and subject to change – a message
12  contrary to P.D.'s own beliefs and which he did not wish to convey to his buddy. P.D.'s
13  required participation in the buddy class therefore directly and immediately affected
14  P.D.'s freedom of speech.

15      "Mandating speech that a speaker would not otherwise make necessarily alters the
16  content of the speech." *Riley,* 487 U.S. at 795. Laws and regulations which alter content
17  of speech in this manner are content based. *Id.* Because such regulation warrants strict
18  scrutiny, *Green v. Miss U.S. of Am., LLC,* 52 F.4th 773, 791 (9th Cir. 2022), Defendants'
19  arguments to apply a lesser level of scrutiny are rejected.[8] "Content-based regulations are
20  'presumptively unconstitutional and may be justified only if the government proves that
21  they are narrowly tailored to serve compelling state interests.'" *Id.* at 791 (quoting *Reed*
22  *v. Town of Gilbert, Az.,* 576 U.S. 155, 163 (2015)).
23  / / / / /
24
25  ────────────────

26  [8]     In addition, Defendants did not specifically discuss the level of scrutiny applicable
27  to Plaintiffs' compelled speech claim under the Free Speech Clause of the First
    Amendment. Defendants' arguments regarding the applicable level of scrutiny were
28  addressed only to Plaintiffs' claims under the Free Exercise Clause.

24cv1611-L-SBC

1    Defendants point to the California Education Code regarding instructional

2  materials and social sciences instruction.  These statutes require schools to include the

3  study of the role played and contributions made to California and national development

4  by members of historically marginalized groups, including lesbian, gay, bisexual, and

5  transgender groups.  *See* Cal. Educ. Code § 51204.5.  California law also prohibits

6  excluding educational materials due to covering the marginalized groups, mandates that

7  these groups be accurately reflected in educational materials, and prohibits their adverse

8  portrayal.  *Id.* §§ 243, 51501, 60040.  Defendants argue that *My Shadow Is Pink*

9  conformed to these requirements.  Its inclusion in the buddy program was intended to

10  stress the acceptance of those who are different and reduce the serious effects of

11  discrimination against gender-diverse individuals.

12    Remedying the effects of past discrimination may serve as a compelling

13  government interest in public education.  *See Parents Involved in Comm. Sch. v. Seattle*

14  *Sch. Dist. No. 1,* 551 U.S. 701, 720 (2007).  Nevertheless, "[b]road prophylactic rules in

15  the area of free expression are suspect[,]" *Riley,* 487 U.S. at 801, and antidiscrimination

16  laws "can sweep too broadly when deployed to compel speech[,]" *303 Creative LLC,* 600

17  U.S. at 592.  The First Amendment imposes limitations on the application of such laws,

18  *see Fields,* 447 F.3d at 1190, and "demands a more precise level of analysis than the high

19  level of generality" offered by anti-discrimination laws, *Green,* 52 F.4th at 791.

20    The California Education Code provisions cited by Defendants and Defendants'

21  reasons for introducing *My Shadow Is Pink* to the buddy program reflect an admirable

22  purpose.  However, they do not meet the requisite narrow tailoring to justify interference

23  with students' freedom of speech.  Laws intended to "eliminat[e] discrimination against

24  LGBTQ individuals" and remedy the serious mental and emotional harm of

25  discrimination are generally insufficient to meet strict scrutiny.  *Green,* 52 F.4th at 791-

26  92.  Further, Defendants have not shown that compliance with Education Code

27  requirements and legislative purpose cannot be accomplished in ways other than

28  compelled speech.  "In the absence of a specific showing of constitutionally valid reasons

1  to regulate their speech, students are entitled to freedom of expression of their views."

2  *Tinker,* 393 U.S. at 511.

3        Based on the foregoing, Plaintiffs have met their burden to show that they are

4  likely to prevail on the merits of their claim that Defendants violated P.D.'s rights under

5  the Free Speech Clause of the First Amendment by requiring his participation in *My*

6  *Shadow Is Pink* buddy class.  In light of this finding, the Court need not review the

7  likelihood of success on the merits of Plaintiffs' remaining claims.

8        **B.**      **Irreparable Harm and Balance of Equities**

9        When, as here, a plaintiff who alleges a constitutional violation and injury "shows

10  he is likely to prevail on the merits, that showing usually demonstrates he is suffering

11  irreparable harm no matter how brief the violation."  *Baird*, 81 F.4th at 1040.  Defendants

12  argue, however, that Plaintiffs have not established that future irreparable harm is likely

13  to occur in the absence of an injunction.  *See Winter,* 555 U.S. at 22.  This argument is

14  unpersuasive because Plaintiffs have provided evidence that Defendants indicated,

15  consistent with anti-discrimination purposes discussed above, that buddy classes like the

16  class involving *My Shadow Is Pink* would be held in the future without prior notice or

17  opportunity to opt out.  (*See* Doe Decl. ¶¶ 67; Pls' Ex. X; Encinas Decl. ¶¶ 55, 63.)

18        Defendants also contend that Plaintiffs failed to show a causal link between P.D.'s

19  constitutional injury and Defendants' infringement of his free speech to show that a

20  preliminary injunction would effectively reduce the risk of harm.  (Opp'n at 17 (citing

21  *Garcia v. Google, Inc.,* 786 F.3d 733, 745 (9th Cir. 2009).)  The Court disagrees.

22  Plaintiffs have shown that P.D. suffered irreparable harm because Defendants infringed

23  on his right to free speech.  "The loss of First Amendment freedoms, for even minimal

24  periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns,* 427 U.S.

25  347, 373 (1976).  Advance notice and an opportunity to opt out would prevent future

26  irreparable harm to P.D.

27        Finally, when, as here, the opposing party is a government entity, the balance of

28  equities and public interest elements merge.  *Baird,* 81 F.4th at 1040.  Accordingly, the

1  movant's "likelihood of succeeding on the merits also tips the public interest sharply in

2  his favor because it is always in the public interest to prevent the violation of a party's

3  constitutional rights." *Id.*  By establishing likelihood of success on the merits of their

4  Free Speech claim, Plaintiffs have also established the remaining elements necessary for

5  a preliminary injunction.

6        **C.    Injunctive Relief**

7        Plaintiffs request a "preliminary injunction prohibiting the [school district] from

8  requiring P.D. and other elementary school students to read, listen, discuss, write about,

9  affirm, and participate in activities or books promoting gender identity without advance

10  notice and opportunity to opt out of the program or curriculum."  (ECF No. 9-1, "Mot." at

11  1.)  Although Plaintiffs' proposal is generally stated to encompass a program or

12  curriculum, Plaintiffs' motion is based on the buddy program.  Plaintiffs have not

13  articulated any claims based on school activities outside that program to warrant a

14  preliminary injunction.  Accordingly, the relief granted by this Order is limited to the

15  buddy program.

16        Defendants object to the form of Plaintiffs' requested relief on several grounds.

17  First, they argue that the requested injunction is mandatory rather than prohibitory.

18  Mandatory injunctions are disfavored "and place a higher burden on the plaintiff to show

19  the facts and law *clearly* favor the moving party." *Fellowship of Christian Athletes v.*

20  *San Jose Unif. Sch. Dist. Board of Educ.,* 82 F.4th 664, 684 (9th Cir. 2023) (emph. in

21  orig.).

> A mandatory injunction orders a responsible party to take action, while a
> prohibitory injunction prohibits a party from taking action and preserves the
> status quo pending the determination of the action on the merits.  [¶]  The
> inquiry is whether the party seeking the injunction seeks to alter or maintain
> the status quo.  [¶]  [T]he status quo is the legally relevant relationship
> between the parties before the controversy arose.

27  *Id.* (status quo before the act which gave rise to the lawsuit).

28  / / / / /

1    Contrary to Defendants' contention, Plaintiffs are not requesting a change of

2  curriculum or implementation of new procedures.  Until *My Shadow Is Pink* buddy class,

3  the buddy program involved art or garden projects, and the school sent parents a weekly

4  newsletter listing the books and activities of the week.  The topics covered in health

5  instruction were not part of the buddy program.  When health instruction included topics

6  such as gender identity, parents received notice and could opt out pursuant to California

7  Education Code Section 51240.  A controversy arose only when gender identity, a topic

8  covered in health instruction, was introduced to the buddy program, but parents did not

9  receive notice and were not allowed to opt out.  To the extent Plaintiffs seek notice and

10 an opportunity to opt out when gender identity is covered in a buddy class, the requested

11 injunction is prohibitory, as Plaintiffs seek to restore the status quo before the controversy

12 arose.

13    Defendants next maintain that the term "gender identity" is vague and it is unclear

14 what specific content or activities would be enjoined.  A preliminary injunction must

15 "state its terms specifically" and "describe in reasonable detail – and not by referring to

16 the complaint or other documents – the act or acts restrained or required."  Fed. R. Civ.

17 Proc. 65(d)(1).

18    The classroom presentation materials shared with P.D.'s parents for purposes of

19 exercising their right to opt out of health instruction on human growth and development

20 included the following definition: "*Gender Identity*:  This refers to whether a person sees

21 themselves as a male or female or something in between, *i.e.,* whether they feel like they

22 are a boy or a girl, or neither or both."  (Pls' Ex. C (emph. in orig.); *see also* Doe Decl. ¶¶

23 26-28.)  Because this is the definition Defendants presented to parents and taught to

24 students, it is adopted for purposes of this Order.

25    This Order applies to buddy classes addressing gender identity topics covered in

26 health instruction.  For example, although *My Shadow Is Pink* buddy class did not

27 explicitly refer to gender identity, the class imparted the same gender identity message as

28 / / / / /

24cv1611-L-SBC

1 | the Human Growth and Development unit of health instruction.  (*See* discussion in

2 | Section I *supra* comparing Pls' Exs. F & C.)

3 |      Finally, Defendants argue that injunctive relief would impose an "administratively

4 | impossible task" because they would have to create a new opt-out system and allocate

5 | unreasonable time and resources to implement it.  (Opp'n at 17.)  This argument is

6 | unpersuasive in light of the numerous opt-out and excuse procedures Defendants already

7 | implement for various curricular and extra-curricular activities.  (*See id.* at 3; Doe Decl.

8 | ¶¶ 72-77; Encinas Decl. ¶¶ 85-86; Pls' Exs. Z, AA, CC, DD.)

## III.    Conclusion

10 |      For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is granted

11 | to the extent that preliminary injunctive relief shall apply only to the Encinitas Union

12 | School District elementary school buddy program, and that buddy program class

13 | activities and materials shall not cover gender identity topics covered in health

14 | instruction, unless Defendants provide parents with advance notice and an opportunity to

15 | opt out.  In all other respects, Plaintiffs' motion is denied.  No later than May 15, 2025,

16 | Plaintiffs shall submit the text of a proposed preliminary injunction consistent with this

17 | Order.

18 |      **IT IS SO ORDERED**.

20 | Dated:  May 12, 2025

 

Hon. M. James Lorenz
United States District Judge

24cv1611-L-SBC